Filed 1/16/15

CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064468 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD244120) |
| ROBERT C. ORLOSKY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh and Albert T. Harutunian III, Judges.  Reversed.

Alex Kreit, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Meagan J. Beale and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

---

\*      Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of Discussion, part IV.

Robert C. Orlosky appeals from a judgment convicting him of marijuana possession and cultivation. He argues the judgment must be reversed because the court refused his request to instruct the jury on the statutory collective cultivation defense, which permits qualified medical marijuana patients to join together to cultivate marijuana to meet their medical needs. The trial court rejected application of the collective cultivation defense on the basis that defendant and his roommate (who were growing marijuana together) had not formed a marijuana collective with some indicia of formality.

The Attorney General acknowledges that an instruction on the collective cultivation defense was likely warranted (although maintaining the particular instruction drafted by defense counsel did not accurately apply to the facts of this case). As we shall explain, although indicia of a formally-organized collective may be a relevant *evidentiary factor* for a jury to evaluate, it is not a *mandatory* requirement that precludes application of the collective cultivation defense to informal joint cultivation arrangements between two qualified patients who grow marijuana exclusively for their own medical use. Accordingly, the court erred in refusing to instruct on the defense. We also find the error was prejudicial.

For guidance in the event of retrial, we also address two additional claims of instructional error raised by defendant. We conclude (1) no mistake of fact instruction was required, and (2) there was no error in the instruction defining marijuana.

As requested by defendant, we have also reviewed the record of an in camera hearing conducted by the trial court in response to defendant's discovery request, and find no abuse of discretion.

2

FACTUAL AND PROCEDURAL BACKGROUND

After receiving an anonymous tip and conducting a preliminary investigation, on October 26, 2012, agents of the federal Drug Enforcement Administration (DEA) and local deputy sheriffs executed a search warrant at the rural property where defendant lived in a trailer with his roommate David Jones. The authorities found numerous marijuana plants at the property, and thereafter charged defendant and Jones with possession of marijuana for sale and cultivation of marijuana. At trial, defendant raised a medical marijuana defense under the Compassionate Use Act of 1996 (Health & Saf. Code, § 11362.5)[1], claiming he was growing marijuana solely for medical purposes. Based on evidence that he and Jones were growing marijuana together and to support a claim that he did not possess marijuana in excess of his *and Jones*'s medical needs, defendant requested the jury be instructed on the collective cultivation defense set forth in section 11362.775, which allows qualified patients to associate to collectively cultivate marijuana for medical purposes. The trial court refused to instruct on this defense based on its view that some level of formality was required to establish the existence of a marijuana-growing collective or cooperative. After hearing the evidence, the jury rejected the charge of possession for sale, but found defendant guilty of marijuana cultivation and marijuana possession.

The prosecution witnesses included defendant's roommate Jones (who apparently pled guilty before trial) and two law enforcement officials involved in the seizure of the

---

1 Subsequent unspecified statutory references are to the Health and Safety Code.

marijuana (federal agent David Lurty and deputy sheriff Matthew Stevens). Defendant testified on his own behalf and called two expert witnesses (patient advocate William Britt and naturopathic doctor Michelle Sexton) to support his claim that he possessed the marijuana solely for medical purposes.

In defendant's bedroom, the authorities found six one-gallon size plastic bags containing processed marijuana bud, a blue tub containing mostly marijuana leaves and shake, and nine marijuana stems (with buds) hanging to dry.[2] In Jones's bedroom, they found a marijuana stem hanging to dry and a small plastic container with some marijuana in it. Outside, the authorities found 11 marijuana plants, including plants that were over six feet tall and that had bud on them. There was indicia of marijuana use in the kitchen and living room areas (i.e., small amounts of marijuana, a couple of marijuana pipes, rolling papers, a bong, a vaporizer, and a small digital scale with marijuana residue on it). The authorities also found two firearms at the residence (an unloaded rifle in the kitchen and a shotgun loaded with two shells in defendant's bedroom), and $2,791 cash in defendant's bedroom. They did not find any pay and owe sheets or "dime bags" that could have been used to sell smaller quantities of marijuana.

Jones was called as a witness by the prosecution to describe the marijuana cultivation activities occurring on the property. Jones's testimony was in large part consistent with the activities described by defendant during the defense case. Jones and

---

[2]    Bud is the flower of the female plant that is typically smoked or ingested by marijuana users. Shake is ground-up marijuana leaves that can be used for edibles or smoking, although according to defense witnesses not all leaves are usable for this purpose and they have less potency than bud.

defendant explained that defendant's father owned the land and rented it to a man named Christian, and Christian in turn rented it to defendant and Jones. Christian was growing about 65 to 70 marijuana plants in an outdoor greenhouse made of PVC pipe, and when the authorities arrived on October 26 all but one of these plants had been harvested or had died. Christian did not live on the property, and Jones and defendant did not participate in Christian's cultivation of his plants.

In March 2012, Jones and defendant started growing marijuana together at the property, with most of the plants placed in a wooden greenhouse they had constructed. Jones (age 24) and defendant (age 23) were both employed, and they both had medical marijuana recommendations from doctors. Jones testified he got his marijuana recommendation in January 2012, and he used marijuana for insomnia and to alleviate pain from an injury that shattered his nose. Defendant testified he obtained his marijuana recommendation starting in 2010, and used marijuana for chronic pain and pain-induced insomnia that arose from accidents in which he broke his pelvis and was shot in the thigh area. Defendant provided a copy of his written marijuana recommendation and also presented testimony from Dr. Sexton, who elaborated on the nature of defendant's injuries, the debilitating nature of the bone pain defendant suffered due to the bullet fragments that remained lodged in his thigh, and his use of marijuana to help him function during the day and sleep at night.

Regarding the amounts of marijuana each used, Jones stated he used about two grams per day and defendant said he used about five to eight grams per day. Defendant explained he used marijuana after work and during the night when he could not sleep, and

his preferred method of use was a vaporizer since it was not as hard on the lungs as smoking. Jones and defendant testified that defendant used the scale found at the residence to measure his daily portions. Defendant stated the doctors who gave him the marijuana recommendations did not tell him how much he should use, but said he would find an appropriate dosage after consuming for a while.

Jones and defendant testified they grew a total of about 15 to 20 plants; defendant did most of the work; and Jones helped by watering the plants and adding nutrients. According to Jones, he was to receive about 10 percent of the marijuana. Defendant estimated that Jones would receive about two to three plants' worth of marijuana. About one month before the authorities arrived, Jones and defendant harvested about three or four plants, dried them, and extracted the marijuana bud and the marijuana leaves that were found in defendant's bedroom. They kept most of the harvested marijuana in defendant's room because it was mainly his marijuana, although Jones was allowed to go into defendant's room and use some of it if he wanted to do so.

About one week before the search, Jones and defendant harvested about five more plants, chopped them in half, and hung them to dry in defendant's and Jones's rooms. Of the 11 plants still growing outdoors when the police arrived, seven were available for the joint cultivation activity. Of the 11 plants, one was brown and unhealthy or dead; one was in Christian's greenhouse and belonged to Christian; and two smaller plants (located

in a structure separate from defendant and Jones's wooden greenhouse) were Jones's personal plants.[3]

Regarding the amount of marijuana they expected to harvest from the plants, Jones testified he and defendant planned to grow the "legal amount." Jones stated he knew very little about growing marijuana; he did not know how big the plants would get or how much marijuana there might be in excess of their medical needs; and he did not know how many plants he would receive based on his 10 percent share of the harvest. Defendant testified he wanted to try growing marijuana because it had gotten too expensive to buy it from dispensaries; he took some horticulture classes to learn how to grow plants and read a brochure about marijuana growing; and he wanted to grow enough marijuana to last for one to two years. However, he did not know how big the plants would get or how much bud he might get from each plant.

According to Jones, when he saw how big the plants grew he assumed there would be marijuana left over after their medical usage, and their plan was to sell any excess to a marijuana collective or a friend who had a medical marijuana recommendation. According to defendant, when they saw how big the plants were growing, Jones mentioned the idea of selling any excess to a collective. Defendant testified he never

---

3      During the search of the property, the authorities also found a variety of other items outside that could be associated with marijuana-growing, including "grow pots"; "grow bags"; a "grow tent" designed for indoor cultivation; and a storage shed with indoor cultivation fans, ventilation tubing, and a ballast to allow for high intensity indoor electrical lighting systems. Jones and defendant said these materials belonged to Christian, and they only grew marijuana outdoors.

7

planned for or investigated selling to a collective, although he might have explored this if there had been a lot of excess and if it was legal to sell to a collective.

Defendant explained he got the shotgun and rifle from his father; he used them for target shooting and for protection or the appearance of protection from illegal immigrants who broke into houses; and the $2,791 cash in his room was from the sale of a backhoe that his father had given him. Apart from the discussion about possibly selling to a collective, defendant testified he never sold marijuana to anyone and never planned to do so. Jones testified he never saw defendant sell marijuana to their friends and never saw any strangers coming in and out of the residence. To refute Jones's claim on this point, DEA agent Lurty testified that when he interviewed Jones, Jones told him that defendant had sold marijuana to Jones's friends.

*Expert Opinions*

The prosecution's evidence concerning the specific amounts of marijuana found in defendant's bedroom showed there was 1.26 pounds of processed marijuana in the Ziploc bags, 12.1 pounds of drying stems, and 2.6 pounds of mostly leaves and shake in the tub. Based on these amounts, as well as a consideration of the plants growing outside and other factors, the prosecution and defense experts presented their views relevant to the amount of usable product, the purpose of defendant's possession, and amounts reasonably associated with medical use.

Prosecution expert Deputy Stevens opined that a person who had 572 grams of processed marijuana in six separate bags, nine drying stems containing bud, 10 growing plants with bud, a weighing scale, and $2,791 in cash would possess these items for sale.

8

He stated this was "a lot of marijuana"; the packaging was indicative of sales; and a person who is using but not selling does not need a scale. He testified a typical joint contains about one-half gram of marijuana, and the effects last about four hours depending on the potency. He stated an outdoor plant can yield about one to five pounds of bud, and acknowledged that the amount of marijuana usually possessed for personal use varies. He opined that after about 30 days, the levels of the marijuana ingredient that makes a person "high" (THC) start to diminish; however, he did not know the rate at which this occurred.

In contrast, defense expert Britt testified that patients frequently use scales for portion control, and marijuana can last up to two years if kept in a cool, dark place, and even after two years it is still usable. He stated that the 1.26 pounds of processed marijuana in the plastic bags was entirely bud, and he estimated there was about three to four pounds of usable bud in the hanging stems; about 10 grams of usable bud in the tub; and about one-half pound to one pound of leaves in the tub that could be used for baking. Relevant to the outdoor plants, Britt explained that the amount of anticipated yield depends on such factors as plant size and the size of the plant's canopy. He opined the seven plants found outdoors and attributed to defendant would yield a total of about three and one-half pounds of bud and the two smaller plants (belonging to Jones personally) would yield about two to three ounces.

Britt testified that because of the growing seasons most people can only harvest marijuana once per year, and it would be reasonable for a patient to cultivate enough to last for one or two years. When viewing photos of defendant's outdoor plants, Britt stated

9

the plants appeared to have been cultivated by a novice grower because they had grown to an unwieldy height; they had not been trimmed to maximize the yield and quality; and the supports for the plants were improperly placed. He said it is very difficult for a novice grower to know what the yield from the plants will be because he or she will not know, for example, how big the plant will grow or whether it will be attacked by pests.

Defense expert Dr. Sexton testified that marijuana is a "pretty stable compound" under ideal storage conditions, although it does degrade over time to some extent; for example, a plant might degrade from 10 percent to 8 percent THC content after the passage of a year. She testified a joint typically contains about one gram of marijuana, and the effects last about three to four hours. She stated doctors do not typically recommend a specific dosage of marijuana because there is a high level of variability in patient tolerance levels and plant potency, and patients are normally told to use the amount that gives them pain relief. Although recognizing this was an "inexact science," Dr. Sexton estimated defendant could reasonably use about eight grams a day of marijuana to control his chronic pain. For example, he could use about one gram every three hours, including during the night, or he could use a higher dosage during the night when pain tends to worsen, and a lower dosage during the day.

*Closing Arguments and Absence of Instruction on Collective Cultivation Defense*

In closing arguments to the jury, the prosecutor argued that the amount of marijuana possessed by defendant was so excessive that it could not have been solely for his medical use; for example, the processed marijuana in his bedroom alone equated with 1,000 (half-gram size) joints. In contrast, relying on the evidence presented by the

10

defense experts, defense counsel argued defendant possessed a total of about 7.7 or 8.7 pounds of marijuana, which was less than the 12.8 pounds that would be required to last for two years at a usage rate of about eight grams per day. As we shall detail below, relevant to the collective cultivation defense, in closing arguments counsel addressed the question of whether Jones's need for medical marijuana could be considered, but no instructions were provided on the collective cultivation defense and the trial court limited defense counsel's ability to fully develop an evidentiary basis to support it.

*Jury Verdict and Sentence*

Defendant was charged with cultivation of marijuana (count 1, § 11358) and possession of marijuana for sale (count 2, § 11359), with an enhancement allegation that he was armed with a firearm for each count (Pen. Code, § 12022, subd. (a)(1)). For count 1, the jury found him guilty of marijuana cultivation, and found the alleged firearm enhancement true. For count 2, it acquitted him of possession for sale, and found him guilty of the lesser offense of possession of more than 28.5 grams (§ 11357, subd. (c)). The court suspended imposition of sentence and placed defendant on three years of formal probation.

DISCUSSION

I. *Law Governing Medical Marijuana*

In 1996, California voters approved a proposition enacting the Compassionate Use Act (CUA) which is designed to "ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes . . . ." (§ 11362.5, subd. (b)(1)(A).) The CUA provides that the criminal statutes proscribing marijuana possession and cultivation

11

do not apply to patients who possess or cultivate marijuana for their personal medical purposes upon a doctor's written or oral recommendation or approval. (§ 11362.5, subd. (d); *People v. Kelly* (2010) 47 Cal.4th 1008, 1012 (*Kelly*).)[4]

The CUA does not specify an *amount* of marijuana that a patient may possess or cultivate, but simply imposes the requirement that the marijuana must be for the patient's "*personal medical purposes*." (§ 11362.5, subd. (d), italics added; *Kelly, supra*, 47 Cal.4th at p. 1013.) This medical purposes requirement has been judicially construed to mean " 'the *quantity possessed* by the patient . . . , and the form and manner in which it is possessed, *should be reasonably related to the patient's current medical needs*.' " (*Kelly, supra*, at p. 1013.)

The CUA includes a provision stating that one of its purposes is to "encourage the federal and state governments to implement a plan to provide for the safe and affordable *distribution* of marijuana to all patients in medical need of marijuana." (§ 11362.5, subd. (b)(1)(C), italics added.) Responding to this directive, in 2003 the California Legislature enacted the Medical Marijuana Program (MMP) which added several new code sections to the Health and Safety Code. (*Kelly, supra*, 47 Cal.4th at p. 1014; *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 782-783.) One of the purposes of the MMP is to " '[e]nhance the access of patients and caregivers to medical marijuana through collective,

---

4      Section 11362.5, subdivision (d) states:  "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."

cooperative cultivation projects.' " (*People v. Colvin* (2012) 203 Cal.App.4th 1029, 1035.)  To effectuate this goal, the MMP includes a provision concerning collective cultivation, stating that "[q]ualified patients who *associate . . . in order collectively or cooperatively to cultivate marijuana for medical purposes*" are exempt from criminal culpability.  (§ 11362.775, italics added; *People v. Urziceanu, supra*, 132 Cal.App.4th at p. 785.)[5]  A qualified patient who may participate in this collective cultivation is defined as "a person who is entitled to the protections of Section 11362.5 . . . ."; i.e., patients who cultivate for medical purposes upon the written or oral recommendation or approval of a physician.  (§ 11362.7, subd. (f).)

Although section 11362.775 clearly provides for collective cultivation, it does not specify what the Legislature meant by an association of persons who engage in collective or cooperative cultivation for medical purposes.  For example, there is no mention of formality requirements, permissible numbers of persons, acceptable financial arrangements, or distribution limitations.  Not surprisingly, therefore, over the past decade there has been considerable litigation as to how the collective cultivation provision should be applied.  Numerous courts have focused on collective endeavors involving the *distribution* of marijuana to large numbers of persons who are not involved in the cultivation activity.  In that context, the courts have concluded the provision

---

[5]    Section 11362.775 states:  "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570."

13

properly encompasses relatively large scale enterprises that distribute marijuana to qualified patients, so long as the enterprise operates on a nonprofit basis and in a manner consistent with distribution for medical purposes. (*People v. Jackson* (2012) 210 Cal.App.4th 525, 529-530, 538-539; *People v. Colvin, supra*, 203 Cal.App.4th at pp. 1036-1037; see *People v. Urziceanu, supra*, 132 Cal.App.4th at p. 785.) Further, the courts have found the collective cultivation provision does not require that all members actively participate in the cultivation process but allows for members to support the cooperative endeavor through, for example, financial contributions to pay for the cost of the cultivation. (*People v. Jackson, supra*, at pp. 529-530, 536-537.)

In addition to judicial authority defining legal distribution endeavors, the Attorney General has issued detailed guidelines that delineate a variety of criteria to assist with identifying legitimate medical marijuana distribution operations, including for example, the dispensary's compliance with state and local licensing and permit laws and the presence of other indicia of a formally organized business. (Attorney General Guidelines for the Security and Non-diversion of Marijuana Grown for Medical Use (Aug. 2008) pp. 8-11 (Guidelines).) [6] This business formality factor has been used by the courts when examining whether a particular marijuana dispensary operation falls within the purview

6     The Guidelines are available at: http://ag.ca.gov/cms_attachments/press/pdfs/n1601_medicalmarijuanaguidelines.pdf [as of January __, 2015].) Additional criteria specified in the Attorney General's guidelines include such factors as limitation of purchase, sale and distribution transactions to persons who are qualified patients and members of the cooperative; limitation of monetary reimbursement from members to amounts necessary for overhead and operating costs; and documentation of each member's contribution of resources to the enterprise. (Guidelines, *supra*, at pp. 8-11.)

14

of criminally-exempt activity under the collective cultivation provision.  (See, e.g., *People v. Jackson, supra*, 210 Cal.App.4th at p. 539; *People v. Solis* (2013) 217 Cal.App.4th 51, 53, 57-59; *People v. Colvin, supra*, 203 Cal.App.4th at p. 1040; *People v. London* (2014) 228 Cal.App.4th 544, 566.)

To date, the legal standards governing the collective cultivation provision, including the references to the business-formality criteria, have been developed primarily in cases involving expansive marijuana distribution operations to persons outside the cultivation activities.  There has been little or no discussion of the collective cultivation defense in the context of informal cultivation efforts among a limited number of qualified patients who simply grow and use their own marijuana with no involvement or distribution to other qualified patients.

In *People v. Jackson, supra*, 210 Cal.App.4th 525—a case involving the question of whether a large scale distribution operation could properly qualify for the collective cultivation defense—this court identified the essential elements of the collective cultivation defense as:  (1) qualified patients who have been prescribed marijuana for medical purposes, (2) the patients collectively associate to cultivate marijuana, and (3) the patients are not engaged in a profit-making enterprise.  (*Id*. at p. 529.)  Of particular import here, we did not identify business formality as a mandatory requirement for the defense in all cases.  Instead, when evaluating the nonprofit requirement, we noted that indicia of a formally organized business will be highly relevant when a marijuana operation has a large number of members and high business volume, and accordingly the

jury should be instructed that it may consider compliance with business formality as a relevant factor. (*Id.* at p. 539.)

Concerning the amount of evidence needed to require instruction on the collective cultivation defense, we emphasized in *Jackson* that the defendant only has a "minimal burden" in this regard. (*People v. Jackson, supra*, 210 Cal.App.4th at pp. 533, 538-539.) That is, the defendant need only raise a reasonable doubt about the existence of the defense, and once this burden is met, the court must provide the instruction and inform the jury that the prosecution has the burden to disprove the defense beyond a reasonable doubt. (*Ibid.*; see *People v. Mower* (2002) 28 Cal.4th 457, 479-481; *People v. Mentch* (2008) 45 Cal.4th 274, 292-294 (conc. opn. of Chin, J.); *People v. Saavedra* (2007) 156 Cal.App.4th 561, 570-571.)

## II. *Refusal To Instruct on Collective Cultivation Defense*

Defendant argues the trial court erred in refusing his request that the jury be instructed on the collective cultivation defense set forth in section 11362.775. Under the particular circumstances of this case, we agree.

Upon request by the defendant, a trial court is required to instruct on a defense that is supported by substantial evidence. (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.) When deciding whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the evidence, but only whether there is evidence which, if believed by the jury, is sufficient to raise a reasonable doubt of guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) The court must "take the proffered evidence as true, 'regardless of whether it was of a character to inspire belief . . . .

16

[Citation.]' [Citation.] ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." [Citations.]' " (*Petznick, supra*, at p. 677.) On appeal, we independently review the court's refusal to instruct on a defense. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

Here, at the close of the presentation of evidence, defense counsel provided the court with a proposed instruction on the collective cultivation defense and requested that the court instruct the jury on the defense. Defense counsel reiterated the instructional request after closing arguments, and then after the jury's verdict, defense counsel filed a new trial motion based on the court's refusal to instruct on the defense. Defense counsel argued instruction on the collective cultivation defense was required because there was evidence defendant and Jones were growing marijuana together; a collective was merely an "association of two or more people who work together to cultivate" and did not need to be organized in any particular fashion; and without an instruction the jury "may be left wondering, well, each of these people can own separately, but they're not supposed to work together, and therefore have enough for two people." The court repeatedly denied defense counsel's request, ruling the defense did not apply to the facts of this case. The court ultimately explained that some level of formality was required to warrant application of the defense, stating: "[W]hatever agreement Mr. Jones and [defendant] had, I don't think that rises to the level of [a] collective" because a collective requires "records, agreements, and not just two guys hanging out together saying, 'hey, maybe we should do this.' "

17

When declining defendant's request for an instruction on the collective cultivation defense, the trial court applied the business formality criteria typically used to evaluate the legitimacy of a broad scale marijuana distribution enterprise, and the court assumed the absence of this formality foreclosed the defense in a case involving an informal cultivation arrangement between two qualified patients.

On appeal, the Attorney General asserts that the specific instruction proffered by defense counsel was not supported by the evidence because it identified factors relevant to medical marijuana dispensaries, not to the alleged two-person collective claimed by the defense in this case.[7] However, the Attorney General acknowledges that "a simple instruction on the right of qualified patients to associate to collectively or cooperatively cultivate marijuana may have been warranted," but argues any instructional error was harmless. Under the circumstances of this case, we conclude the court erred in failing to instruct on the defense, and the error was prejudicial.

When interpreting the collective cultivation provision, we view the statutory enactment as a whole; consider the plain, commonsense meaning of the statutory language; and seek to effectuate the law's purpose. (*People v. Fandinola* (2013) 221

---

[7] The instruction drafted by defense counsel, derived in part from the Attorney General's Guidelines, sets forth the concepts that under the MMP, qualified patients may associate to collectively or cooperatively cultivate marijuana for medical purposes; a collective is an organization that facilitates the collaborative efforts of patients; it is not a statutory entity but as a practical matter might have to organize as some form of business to carry out its activities; it should not purchase from or sell to nonmembers; marijuana may be allocated based on fees reasonably calculated to cover overhead and operating expenses; and not all members must participate in the cultivation as long as the collective is nonprofit.

18

Cal.App.4th 1415, 1421-1422; *People v. Colvin, supra*, 203 Cal.App.4th at p. 1037.) The collective cultivation provision set forth in section 11362.775 refers to *qualified patients* who associate to *collectively or cooperatively cultivate marijuana*. As noted, neither the statute itself, nor case law, have specified any size or formality requirements for the proper creation of the cooperative endeavor. Although business formality has been identified as a *relevant evidentiary criterion* that increases in probative value as the size of the marijuana distribution enterprise increases, it has not been identified as a *mandatory* requirement that *automatically* excludes all informal collective cultivation arrangements from the purview of the collective cultivation defense. (*People v. Jackson, supra*, 210 Cal.App.4th at p. 539.) Thus, the plain language of the collective cultivation statute, as well as the manner in which the business formality factor has been judicially applied, reflects that the absence of formality does not foreclose establishment of the collective cultivation defense in a case involving a joint cultivation endeavor confined to two qualified patients with no outside distribution.

Further, permitting application of the defense to informal collective cultivation activity is consistent with the overall statutory goal of ensuring that qualified persons have access to marijuana for medical use. Considering the broad language used in the collective cultivation provision in conjunction with the legislative goal of providing access, the statutory scheme encompasses legitimate medical marijuana collective cultivation activities between two qualified patients who grow only for themselves. (See *People v. Colvin, supra*, 203 Cal.App.4th at p. 1041 [evaluating application of section

19

11362.775 to large marijuana distribution operation, but recognizing that Legislature may have "envisioned small community or neighborhood marijuana gardens"].)

Accordingly, we conclude that when there is substantial evidence to support that two qualified patients are engaging in an informal cultivation arrangement to grow and share marijuana only among themselves for medical purposes with no distribution to outsiders, the absence of business formality does not preclude submitting the defense to the jury for its consideration. Thus, the court erred when ruling the collective cultivation defense could not be applied in this case without evidence of a formally organized collective.

*Substantial Evidence Supporting the Instruction*

Because the informal nature of the cultivation arrangement in this case did not foreclose application of the collective cultivation defense, the court was required to instruct on the defense if there was substantial evidence to support it. The record shows the required substantial evidence. There was no dispute that defendant and Jones were growing marijuana together. Also, there was evidence that Jones, like defendant, was a qualified patient. Jones testified he had a marijuana recommendation from a doctor and that he used marijuana for pain and insomnia. The CUA permits assertion of the compassionate use defense upon a written *or oral* doctor's recommendation, and Jones's testimony that he had this recommendation was sufficient to warrant submitting the issue of his qualified patient status to the jury for its determination. (§ 11362.5, subd. (d); see *People v. Jones* (2003) 112 Cal.App.4th 341, 350-351 [based on defendant's testimony that he had doctor's oral approval to use marijuana, trial court was required to allow

20

presentation of compassionate use defense to jury].)  Finally, there was testimony from Jones, defendant, and the defense experts that supported the view that the amount of marijuana possessed by defendant was reasonably related to defendant's and Jones's combined medical needs.

*Prejudice*

The failure to instruct on the collective cultivation defense requires reversal regardless whether we apply the reasonable probability of a different outcome standard for state law error or the harmless beyond a reasonable doubt standard for federal constitutional error.  (*People v. Salas, supra*, 37 Cal.4th at p. 984 [prejudice test for failure to instruct on defense not yet determined]; *People v. Rogers* (2006) 39 Cal.4th 826, 871-872 [harmless beyond a reasonable doubt standard applies when error deprives defendant of right to present complete defense]; *People v. Demetrulias* (2006) 39 Cal.4th 1, 23.)

The key disputed issue at trial was whether the amount of marijuana grown and possessed by defendant exceeded a legitimate medical purpose.  The jury was instructed that under the compassionate use defense, the "amount of marijuana possessed or cultivated must be reasonably related to *the patient's* current medical needs."  (Italics added; see CALCRIM Nos. 2370, 2352, 2375.)  However, the jury was given no instruction indicating that if it found defendant and Jones to be qualified patients who were growing marijuana together for their own use, defendant could lawfully grow marijuana commensurate with *two patients*' medical needs.

21

Thus, when the jury was evaluating the pivotal issue of whether defendant had an excessive amount of marijuana that would preclude application of the compassionate use defense, it had not been told it could consider defendant's possession and cultivation in light of the evidence that he was engaging in a cooperative growing operation with another qualified patient. The jury's view of the reasonableness of the amounts possessed by defendant may well have been altered had it been instructed on the collective cultivation defense and based thereon decided to incorporate Jones's medical needs and usage into its calculations.

Also, although there were some references in the record to the existence of the collective cultivation defense, in several instances the trial court precluded defense counsel from fully developing the evidentiary basis for the defense. That is, defense counsel elicited brief testimony from defense expert Britt about the collective cultivation defense, and in closing arguments defense counsel urged the jury to consider both defendant's and Jones's medical needs, whereas the prosecutor told the jury that defendant could only grow marijuana for himself because there was not enough evidence to establish that Jones was a qualified patient. However, the trial court sustained relevancy and/or hearsay objections when defense counsel sought to elicit testimony from Britt about a small collective, from Dr. Sexton about her knowledge of Jones's medical needs, and from defendant about his knowledge of Jones's marijuana recommendation.

At best, the jurors may have gleaned from these references that collective cultivation can be raised as a defense, but they could have been easily misled to think the defense did not properly apply to this case because the defense was not mentioned in the

22

instructions and they heard the court curtailing defense counsel's attempts to elicit additional testimony relevant to the defense. Without guidance from the court on this area of the law, the jury might have thought (as did the court) that the defense was legally inapplicable to defendant and Jones because they were not a formally organized collective or cooperative. Also, because no affirmative instruction on the defense was provided, the jury may not have recognized that *the prosecution had the burden to disprove* that defendant was engaged in collective marijuana cultivation with Jones for medical purposes.

Finally, the record does not show that defendant necessarily possessed an amount of marijuana that was so beyond reasonable medical usage for two people as to foreclose the probability of application of the compassionate use defense even with proper instruction on the collective cultivation defense. In addition to the evidence about defendant's and Jones's medical marijuana recommendations, usage, and cooperative cultivation, the jury was presented with evidence concerning defendant's gunshot injury and need for pain medication, and expert views about the amount of marijuana he could reasonably use, the reasonableness of cultivating marijuana to last for several years, the uncertainties of yield results for novice growers, and the amount of usable marijuana he possessed. The jury needed to evaluate this evidence to decide if defendant was selling marijuana, whether he was a qualified patient, and if so, whether he possessed and/or cultivated marijuana beyond his (and possibly Jones's) reasonable medical needs.

The jury rejected the prosecution's claim that defendant possessed the marijuana with the intent to sell it, which indicates the jury did not view the amounts he possessed

23

as outside the realm of possession for personal use.  Although the record can support that defendant had an amount of marijuana beyond what would be reasonable to establish the compassionate use defense, the record can also support a contrary conclusion if the jury credited all or part of the defense evidence.

Because the primary dispute in this case was whether defendant's possession and cultivation exceeded a legitimate medical purpose, and because there is a reasonable probability the jury's assessment of this issue would have been different if the jury had been instructed that the law permits collective cultivation among qualified patients, the failure to instruct on the collective cultivation defense requires reversal.

### III.  *Guidance in the Event of Retrial*

To assist the court and parties if the case is retried, we address defendant's two additional claims of instructional error:  (1) the jury should have been instructed on mistake of fact, and (2) the jury was incorrectly instructed on the definition of marijuana. We need not address defendant's claim that the court improperly excluded an item of expert testimony proffered from defense witness Britt since this is a matter for resolution should it arise again in any retrial.

### A.  *Failure To Instruct on Mistake of Fact*

Defendant argues the trial court erred by failing to sua sponte provide, or his counsel was ineffective for failing to request, an instruction on the mistake of fact defense.  In support, defendant contends there was evidence from which the jury could find that he mistakenly estimated the amount of marijuana his plants would yield, or the dosage of marijuana needed for his medical condition.

24

Generally, a trial court has a sua sponte duty to instruct on principles of law that are closely and openly connected to the facts and necessary to the jury's understanding of the case (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047), and defense counsel has a duty to request all instructions that are necessary to explain the legal theories of defense (*People v. Sedeno* (1974) 10 Cal.3d 703, 717, fn. 7). If the defendant had an honest and reasonable belief in the existence of circumstances, which, if true, would make the act an innocent act, the mistake of fact defense applies. (*People v. Lucero* (1988) 203 Cal.App.3d 1011, 1016-1017.) A mistake of fact occurs when a person understands the facts to be other than what they are. (*People v. LaMarr* (1942) 20 Cal.2d 705, 710.) "A mistake of fact exists 'when one makes an erroneous perception of the facts as they actually exist . . . . The defense arises only where the defendant misperceives an objective state of existing fact . . . .' " (*State v. Beltran* (1998) 246 Conn. 268 [717 A.2d 168, 172].)

Assuming that in some circumstances a court may have a sua sponte duty to instruct on mistake of fact, on this record we find no error, nor do we find ineffective assistance of counsel.[8] In defendant's trial, factors such as the potential yield from the plants and the amount medically needed by defendant were not presented as *actual facts* that defendant could have *misperceived* to potentially relieve him of culpability; rather,

---

8    There is no sua sponte duty to instruct on the mistake of fact defense in cases where the claimed mistake merely negates a mental state element that has been fully explained to the jury in the instructions, so that the mistake of fact instruction is no more than a pinpoint instruction on a defense claim. (*People v. Lawson* (2013) 215 Cal.App.4th 108, 117-119.)

25

they were presented as opinions and matters that could vary depending on the circumstances. For example, a defense witness indicated it was difficult for novice growers to determine the yield of their plants and opined that defendant's seven outdoor plants could have yielded a total of about three and one-half pounds of marijuana, whereas a prosecution witness opined the typical yield from an outdoor plant can be between one and five pounds. Further, defendant explained how his doctors did not provide a dosage amount to guide him, and a defense expert presented her views on the variability of dosages among patients and the amount defendant could reasonably use on a daily basis.

On this record, showing a multiplicity of views and opinions concerning yield expectations and reasonable usage amounts, a defense claim that defendant miscalculated or misunderstood these matters arose not from misperceptions of the facts *as they actually were* but rather from the existence of different viewpoints and uncertainties concerning yield and usage amounts. These differing views and uncertainties were relevant for the jury to consider when evaluating all the circumstances to determine whether defendant confined his possession and cultivation to amounts reasonably related to medical purposes, but they were not actual facts that were misunderstood by defendant as normally contemplated by the mistake of fact defense.

Although in some circumstances it might be appropriate to provide a mistake of fact instruction with respect to the issue of reasonable medical needs, on this record the trial court was not required to provide the instruction sua sponte, nor did counsel's failure to request it rise to the level of ineffective representation.

26

B. *Instruction on Definition of Marijuana*

Defendant asserts the court erred in declining his request that the jury be instructed on a particular definition of marijuana set forth in the MMP portion of the Health and Safety Code (§ 11362.77, subdivision (d)), rather than the definition of marijuana set forth in the general definitions section of the Health and Safety Code provisions governing controlled substances (§ 11018).

The jury was given the standard CALCRIM instructions that delineate the offenses of unlawful marijuana possession and cultivation as well as the compassionate use defense, and include a definition of marijuana derived from the general definitions section of the Health and Safety Code. (See CALCRIM Nos. 2370, 2352, 2375; §§ 11000, 11018.) This definition generally states that marijuana can include *all parts of the plant*, with some exceptions such as the stalks and certain types of seed derivatives.[9] In contrast, section 11362.77, subdivision (d) of the MMP contains a narrower definition of marijuana, confining it to the "*dried mature processed flowers*" of the plant. (Italics added.) As we shall explain, the trial court correctly ruled the narrower MMP definition was not applicable to this case.

---

[9]    The jury was instructed: "*Marijuana means all or part of the Cannabis species plant*, including Cannabis sativa L. and Cannabis indica, whether growing or not, including the seeds and resin extracted from any part of the plant. It also includes every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or resin. *It does not include the mature stalks of the plant*; fiber produced from the stalks; oil or cake made from the seeds of the plant; any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin extracted there from), fiber, oil, or cake; or the sterilized seed of the plant, which is incapable of germination." (Italics added and some italics in original omitted.)

27

The MMP includes "safe harbor" provisions that allow patients who suffer from serious medical conditions to voluntarily obtain medical marijuana identification cards which provide them protection from arrest. (*Kelly, supra*, 47 Cal.4th at pp. 1014-1015; § 11362.71, subd. (e).) In contrast, qualified patients who do not have identification cards are not shielded from arrest, but must seek relief from criminal penalties by raising their qualified patient status as a defense. (*Kelly, supra*, at pp. 1012-1014.) The MMP also contains a provision (§ 11362.77) stating that a qualified patient may possess only a maximum of "eight ounces of dried marijuana," unless a doctor recommends that this quantity will not meet the patient's medical needs. (§ 11362.77, subds. (a), (b).) This same section (§ 11362.77) contains the narrower definition of marijuana cited by defendant, stating that only the "dried mature processed flowers of female cannabis plant or the plant conversion shall be considered when determining allowable quantities of marijuana *under this section*." (§ 11362.77, subd. (d), italics added.)[10]

In *Kelly*, the court held that section 11362.77's eight-ounce limitation could *not* be used to override the CUA's allowance of medical marijuana possession in an amount reasonably related to the patient's medical needs. (*Kelly, supra*, 47 Cal.4th at pp. 1012,

---

10    These subdivisions of section 11362.77 state:  "(a) A qualified patient or primary caregiver may possess *no more than eight ounces of dried marijuana* per qualified patient.  In addition, a qualified patient or primary caregiver may also maintain no more than six mature or 12 immature marijuana plants per qualified patient.  [¶]  (b) If a qualified patient or primary caregiver has a doctor's recommendation that this quantity does not meet the qualified patient's medical needs, the qualified patient or primary caregiver may possess an amount of marijuana consistent with the patient's needs. [¶] . . . [¶]  (d) *Only the dried mature processed flowers* of female cannabis plant or the plant conversion *shall be considered when determining allowable quantities of marijuana under this section*."  (Italics added.)

28

1043-1049.) That is, although a patient with an identification card and possessing no more than eight ounces of marijuana may seek protection from arrest under the MMP's safe harbor provisions, the eight-ounce limitation may not be used to burden the reasonable medical needs defense authorized by the CUA. (*Kelly, supra*, at pp. 1012, 1024, 1048-1049.)

Here, because defendant was raising the CUA as a defense and not seeking protection under the MMP's safe harbor provisions, section 11362.77's eight-ounce restriction was inapplicable. Consistent with this, the jury was instructed that under the CUA "[t]he amount of marijuana possessed or cultivated must be reasonably related to the patient's current medical needs." (CALCRIM No. 2370.) The jurors were also given a special instruction explicitly advising them that the eight-ounce limitation did not apply.

By its plain terms, section 11362.77's narrower marijuana definition applies only "when determining allowable quantities of marijuana *under this section*" (italics added); that is, when determining the eight-ounce limitation set forth in section 11362.77. Because defendant's CUA defense was not governed by section 11362.77's eight-ounce limitation, section 11362.77's narrower definition of marijuana did not apply.

We note the prosecutor argued to the jury that defendant's written medical marijuana recommendation implicitly limited his possession to the eight-ounce maximum set forth in the MMP because his doctor apparently did not fill out a portion of a recommendation form asking if there was an exemption to the statutory limitation. However, as stated, the jury was instructed that defendant's possession was not governed

29

by the eight-ounce restriction, and the prosecutor's attempt to argue that defendant's prescription allowed possession of only eight ounces did not make this statutory limitation the governing standard in defendant's case.[11]

Because defendant's CUA defense was not governed by section 11362.77's eight-ounce limitation, the trial court properly declined to instruct the jury on the definition of marijuana set forth in that section.

IV. *Review of In Camera Hearing on Defendant's Discovery Request*

Defendant requests that we review the record of an in camera hearing held by the trial court to determine if the court abused its discretion in declining to order disclosure of a photograph depicting marijuana cultivation on the property where defendant lived. The photograph was provided to the authorities by an anonymous source and was referenced in the search warrant executed at defendant's residence.

In response to defendant's request for disclosure of the photograph (plus disclosure of the identity of the anonymous source), the prosecutor requested that the court either deny the request because the material was irrelevant, or conduct an in camera hearing outside the presence of the defense to determine if the anonymous informant privilege (Evid. Code, §§ 1041, 1042) applied to bar disclosure. After conducting the in camera

---

[11]     Since this issue has not been raised on appeal, we express no opinion as to the propriety of the prosecutor's assertion that defendant's doctor's recommendation implicitly permitted him to possess only eight ounces of marijuana.

hearing, the court ruled the material was privileged and, further, it did not constitute *Brady*[12] material.

The People need not disclose the identity of an anonymous informant if the public interest requires that confidentiality be maintained, unless the trial court determines at an in camera hearing that there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial. (Evid. Code, §§ 1041, 1042, subd. (d); *People v. Lawley* (2002) 27 Cal.4th 102, 159-160; *People v. Ruiz* (1992) 9 Cal.App.4th 1485, 1488-1489; see *People v. Dickey* (2005) 35 Cal.4th 884, 907-908 [*Brady* disclosure obligation triggered only if evidence is favorable to defendant and material on issue of guilt].) We review a trial court's disclosure decisions under the abuse of discretion standard. (*Davis v. Superior Court* (2010) 186 Cal.App.4th 1272, 1277.)

---

[12] *Brady v. Maryland* (1963) 373 U.S. 38.

At defendant's request and with no opposition from the Attorney General, we have reviewed the record of the in camera hearing and find the court did not abuse its discretion in declining to order disclosure of the photograph. The sealed record supports that disclosure of the photograph would not provide information favorable to defendant's case, and the photograph was properly kept confidential to maintain the anonymity of the source.

DISPOSITION

The judgment is reversed.

_____
HALLER, Acting P. J.

WE CONCUR:

_____
O'ROURKE, J.

_____
AARON, J.