Filed 5/24/16  P. v. Meraz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EFRAIN BARAJAS MERAZ,<br><br>Defendant and Appellant. | F068213<br><br>(Super. Ct. No. VCF273470A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Valeriano Saucedo, Judge.

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Jeffrey Grant, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Having rejected his medical marijuana defense, a jury convicted Efrain Barajas Meraz (defendant) of possessing marijuana for sale (Health & Saf. Code,[1] § 11359; count 1), cultivating marijuana (§ 11358; count 2), and transporting marijuana (§ 11360, subd. (a); count 3). Defendant was placed on probation for three years on condition, inter alia, that he serve 270 days in jail. He was also ordered to pay various fees, fines, and assessments. We conclude substantial evidence supports the conviction of possession for sale, the trial court did not commit prejudicial evidentiary or instructional error, and defendant is not entitled to reversal based on ineffective assistance of counsel. Accordingly, we affirm.

## FACTS

On the morning of September 20, 2012, Tulare County Sheriff's Deputy Nulick was on patrol when he was dispatched to perform a welfare check at a single-family dwelling on Kate Road, in the town of London. Upon his arrival, he saw Antonio Sanchez in the back part of the residence.

While Nulick was talking with Sanchez in the yard, he smelled marijuana. He also saw some lying on a bench by the house. When Nulick asked if there was more inside the house, Sanchez responded affirmatively and gave Nulick consent to search. Inside, there was marijuana lying on the floor and hanging in both rooms. Nulick asked Sanchez if it was his; Sanchez responded that he did not know and was just taking care of the house. The investigation was turned over to Detective Rader of the STEP (Sheriff's Tactical Enforcement Personnel) unit.

The STEP unit was the primary Special Weapons and Tactics team for the sheriff's department. The unit was also responsible for narcotic search warrants and investigating all marijuana cases in the county. Rader himself had attended a

---

[1] Further statutory references are to the Health and Safety Code unless otherwise stated.

Proposition 215 update presented by the California Narcotics Officers Association[2]; helicopter and fixed wing overflight school, where he was trained to identify marijuana from both type of aircraft; and a wilderness tactical school, where he was trained to locate, approach, and investigate outdoor marijuana grows. In addition, he participated in daily briefings regarding current trends in marijuana cultivation and sales; spoke with other law enforcement officers within his department and at other agencies regarding marijuana investigations; participated in the service of search warrants in marijuana cases; and had written more than 20 search warrants for marijuana investigations. He was familiar with the look, feel, and smell of marijuana, in both plant and processed forms. During his investigations, he came into contact with users, growers, and sellers of marijuana on a daily basis. He interviewed them, and they sometimes spoke to him about using, growing, and selling marijuana. He had testified in Tulare County at least five times as an expert in the investigation of marijuana cultivation and possession for sale cases. He had taken Department of Justice training regarding marijuana investigations early in 2012. He had studied and read the law regarding marijuana possession and the use thereof, although he had not attended any training that was specified as "scientific." He had read numerous articles and books on marijuana cultivation, including materials regarding grows owned and operated by cooperatives versus privately owned grows versus "guerrilla" grows. He was aware there were many things an investigating officer must do, especially in marijuana grows, to determine whether the purpose was personal use or possession for sale.

Upon Rader's arrival at the residence on Kate Road, he was briefed by Nulick and then assumed the primary role in the investigation. He conducted a search of the property, which was about an acre in size, and the house. The house, which was fairly

---

[2] The initiative measure known as Proposition 215, approved November 5, 1996, enacted the Compassionate Use Act (§ 11362.5).

3.

small, consisted of a kitchen/dining room area, a living room, two bedrooms, and a bathroom.

The entire ceiling of the southeast bedroom had partially processed marijuana hanging from twine, while the entire floor was covered in marijuana trimmings and marijuana that had not yet been processed to the point it was ready to hang.[3] Along one wall was a large toolbox, on top of which were tools related to the processing of marijuana: scissors, 10 empty vacuum-sealable bags used for packaging (but no heat-sealing machine), and a scale. There was a chair with a large fan on it to circulate the air in the room.[4] There was also fully processed marijuana in a cardboard box in the room.

The southwest bedroom contained a mattress and box spring. On the floor lay partially processed marijuana with two running fans pointing at it, so that air was flowing over the marijuana. The bed had blankets and pillows, and there was clothing strewn about the room. The clothing was consistent with Sanchez's size. There was also children's clothing on the premises, as well as multiple toothbrushes.

A small amount of partially processed marijuana was found on a shelf in the carport. Shake marijuana (everything left over from processing without the bud itself) was also found in the carport.[5] There was a small room attached to the carport; it held

---

[3] Rader explained that partially processed marijuana is a marijuana branch that has been removed from the plant itself and partially trimmed to remove leaves and excess plant material, but the flower (also called the cola or bud) is still on the stem. The stem is then hung upside down or laid out so air can circulate over or around it. Fully processed marijuana is the flower that has been dried and trimmed to remove as much excess stem and leaf material as possible. Fully processed marijuana is ready for packaging.

[4] Rader explained that marijuana is very susceptible to mold. Because moldy marijuana is "no good," it is important to the cultivator to get the marijuana dried evenly and quickly. Fans are used to circulate fresh air for the drying process.

[5] According to Rader, shake marijuana is usable for all kinds of cannabis byproducts, especially concentrated cannabis such as honey oil. Concentrated cannabis is much more potent than what can be obtained just from the bud. Rader found no evidence of concentrated cannabis at the house.

gardening equipment, including black trays with one-inch divided squares. In Rader's experience, those could be used for transporting young plants. Although he commonly found trays consistent with what were in the carport, he could not say with certainty they were used for marijuana in this case as opposed to, for example, tomatoes.

The various types of marijuana were weighed during the investigation. The fully processed marijuana weighed 9.88 pounds. The total weight of all partially processed marijuana was 68 pounds. Rader performed a weight analysis, which involved randomly choosing three branches of partially processed marijuana, weighing each branch separately, completing the processing, weighing the bud itself, calculating the percentage of the branch's weight that was just bud, and then applying that percentage to the whole. Because he believed, based on his training and experience and investigation, the marijuana was recently removed from the plant and so was not yet dried completely, he also took the moisture weight into account. Using that procedure, which did not give an exact weight, but gave a close estimate of what the yield of fully processed marijuana would be, he calculated the partially processed marijuana would have yielded at least 40 pounds of fully processed marijuana. This was separate from the almost 10 pounds of fully processed marijuana found at the house. In addition, the shake in the carport weighed 15 pounds.

Rader interviewed Sanchez at the scene. Sanchez said the marijuana had come from his friend's house in Reedley and he had gone there to pick it up. Sanchez said he had brought it to his own house to process it. He first said he learned how to process it from watching the news. He later said he learned to do it on his own. Sanchez said he did not have a medical marijuana recommendation.[6]

---

[6] At trial, Sanchez testified he resided at the house and knew marijuana was there, but the marijuana belonged to defendant. Defendant had brought the marijuana to the house, but Sanchez did not remember when, because he was working and often spent the night at his sister's residence in Dinuba. Defendant, who had a doctor's permit to grow and use marijuana as medicine, was going to donate it to a clinic. Sanchez did not have a

5.

Defendant arrived while Rader was at the scene. Because nobody on Rader's team had asked defendant to come, Rader asked what he (Rader) could do for defendant. Defendant said he did not understand his rights and did not understand what he could or could not say. Although he had not been arrested or even detained, he was advised of his rights to make sure he understood what was going on. After the advisement, defendant agreed to speak with Rader.

Defendant said the marijuana at the scene was his. He stated he owned a place in Reedley and had a marijuana grow on his property. He said he had recently harvested 40 plants, and had 50 plants at his house.[7] Someone tried to steal the recently harvested plants, so he brought them to Sanchez's house, where he thought they would be safe. He denied paying or giving Sanchez anything to store or process the marijuana for him.

Defendant handed Rader a medical marijuana recommendation from Dr. Terrell Brown. The document, which was in defendant's name, recommended he could grow up to 90 plants and possess up to six pounds of processed bud. Defendant said he intended to keep that six pounds for himself, and donate the rest to a clinic, which Rader understood to mean a dispensary. Because there were numerous dispensaries and medical marijuana storefronts, Rader attempted to determine which dispensary defendant meant. Defendant said he was not sure, and that he had only heard of a clinic in Fresno that gave gifts or plants in return for donations. Defendant was unable to provide Rader with the specific name of any dispensary to which he planned to donate. He said he did

---

doctor's recommendation or approval. He denied having done anything to the marijuana or knowing how to process it. He claimed a scale found in one of the rooms was for weighing large boxes of grapes.

**7** The trial testimony never clarified whether defendant had planted a total of 90 plants or only 50. Although defendant never said he planted 90 total, when Rader told defendant there was no reason for defendant to have 50 plants at his house and 25 pounds of marijuana at the Sanchez house, defendant responded, "Am I wrong for giving it away?"

not know the name or exact location. When Rader asked when defendant planned on taking it to the clinic, defendant responded, "I don't know, whenever it's going to be ready."

Radar inquired about defendant's personal use of marijuana. Defendant said he smoked two to three small joints a day.[8] Rader clarified what defendant meant, and understood him to say he smoked two to three half-gram joints a day. By Rader's calculation, that added up to just over a pound a year at most. Defendant said he had not used marijuana in a month and a half, however, during which time he had been taking Advil for his pain.[9] Defendant said he did ranch labor work and was self-employed, growing three or four kinds of vegetables.

Defendant said he had incurred expenses of $200 to $300 in growing his marijuana. In Rader's experience, that amount was inconsistent with the cost of growing 90 marijuana plants because fencing materials, nutrients, and irrigation materials could be very expensive. Defendant said he already had the fencing materials and only bought a roll of plastic for his fencing. Rader wanted to go to defendant's property and investigate the remaining marijuana plants growing there, but Rader's jurisdiction was Tulare County, and defendant's property was in Fresno County.[10]

---

[8]     Rader explained that in his experience, a joint looked like a nonfiltered cigarette and weighed between half a gram and a gram. It was commonly called a "small cigarette." A blunt, or what was sometimes called a "large cigarette," was about the size of a cigar.

[9]     Defendant said he suffered from back pain, and that prescription medicine hurt his stomach and made him not feel well, which was why he was using marijuana instead of prescription drugs. When Rader said, as an investigative technique, that defendant had not smoked marijuana in a month and a half and so did not need any real medication, defendant responded no, that it was because he did not have any.

[10]     Rader contacted the Fresno County Sheriff's Department and informed them of what he had found. Defendant told Rader that Fresno County sheriff's officers previously had visited the site.

Rader basically accused defendant of lying about only wanting to get six pounds of marijuana for his personal use out of the marijuana he was growing. Defendant responded that he had not sold any. Rader again accused him of being untruthful. Defendant insisted he had not sold any of the marijuana. When Rader asked why defendant planted 50 plants if he only needed six pounds, defendant responded, "So how many should I have planted? I don't know." Defendant said he did not know the weight of the marijuana cigarettes he smoked or how much marijuana he used per year. He said he had never weighed it.

As a detective in the STEP unit, Rader was called upon daily to determine whether marijuana being seized was for personal use or for sales. Many factors went into this determination, including the amount of marijuana, how it was being grown, the environment in which it was being grown, how it was being processed, what was being used to process it, what was being used to store it once it was processed, and the medical recommendations. Rader also looked at the number of people present and the number of people with a stake in the marijuana, handwritten notes that might be "laying around," and "any other crimes" present.

Whether someone had a medical use recommendation was only one small part of the investigation, and did not initially affect Rader's decision whether to stop the investigation. Rader considered recommendations because the person could have a legitimate medical claim, but Rader would not stop investigating just because there was a recommendation. In his experience, the fact someone had a medical marijuana recommendation from a doctor did not mean that person was not going to sell the marijuana. Rader had read about legitimate medical use and individuals' legitimate claims, but, in the hundreds of marijuana investigations he had conducted, he had yet to see a legitimate Proposition 215 medical marijuana grow.[11] Rader opined that the

---

[11] Rader acknowledged his partners had been to marijuana grows where they had encountered people articulating they were legitimate users of medical marijuana, and the

8.

medical marijuana laws were "grossly abused" and used as cover by people growing marijuana for sale. Despite this, Rader's agency "[a]bsolutely" did not assume every marijuana case was a violation of the law.

In Rader's experience, it was very common for people who were growing and possessing marijuana for sale to have the marijuana processed and packaged at a location separate from where the marijuana was grown. This was because growing the number of plants shown on one's medical recommendation would indicate personal use, but processing would not.

Standard yields — how much marijuana bud could be expected from marijuana plants — were dependent on many factors, including the species, location, weather, and fertilization. In Rader's opinion, no one could look at seedlings and determine yield. By examining plants that were fully mature and ready to harvest, and having experience with yields, one "could come up with a pretty good guess, but only at that time." Rader had been told in training that one pound per plant was an acceptable estimated yield. Rader knew, through his training and experience and speaking to cultivators, certain plants were capable of producing a far greater amount. There was no way to tell, however, without actually seeing the mature plant ready for harvest or recently harvested.

The amount of marijuana found at Sanchez's house easily could have been produced by 40 plants, the number defendant said he recently had harvested. Marijuana generally was sold in one-pound packages by large-scale distributors. Cultivators who possessed marijuana for sale did not sell at retail, but rather packaged their marijuana as quickly as they could and got it to street-level dealers or someone who could distribute it to such dealers. In California, wholesale prices for mediocre marijuana ranged from

---

facts had merely been documented and the case suspended without further action on the officers' part.

$1,000 to $3,000 per pound. On the street, the marijuana would then be sold for $15 to $20 per gram, making the retail price approximately $9,400 per pound.

In response to a hypothetical question that tracked the trial evidence, Rader opined the marijuana found at the house was possessed for sale. His opinion was based on the amount of marijuana present, the presence of packaging materials, and the fact somebody dedicated his home to processing marijuana. Because of the gross amount of marijuana (which, had it been sold out of state, would have been worth over a quarter million dollars), it would not change Rader's opinion to know for certain that a doctor had recommended marijuana for the personal use of the person who claimed ownership. Nor would it change his opinion if the doctor had recommended six pounds and 90 plants. Most of the recommendations Rader saw were for 90 or 99 plants, and six or eight pounds. He rarely saw recommendations for less.

Rader's impression of the marijuana found in this case was that it was decently grown. It was not "junk." The fully processed marijuana was of good quality. In Rader's opinion, it was not "somebody's first-time luck growing it." Defendant spoke as if he knew very little about marijuana, however, and told Rader it was the first time he had grown. Rader had no evidence defendant had knowledge of yields, and no evidence defendant previously had grown marijuana.

Rader had no physical evidence defendant was processing the marijuana, had transported it to the house, or sold or furnished marijuana to anyone. Defendant said he was going to keep what the doctor said he could have and donate the rest to a dispensary. Defendant said he had been told by the doctor who gave him the recommendation that he could donate his excess to a dispensary. When Rader asked why defendant would donate so much, defendant said he knew what it was like to be ill. Rader believed the quantity of marijuana, its street value, and the manner in which it was being handled, coupled with his training and experience, constituted physical evidence belying defendant's stated intent. Defendant said he had not sold any and he wanted to donate it. In Rader's

10.

training and experience, that was a sale.[12]  In Rader's opinion, when someone did not know the name or location of a dispensary, was willing to dedicate his living space to process marijuana, and had a quarter million dollars' worth of marijuana in the living area, that person was not a legitimate member of a collective or cooperative and intended to sell the marijuana.  Although it was Sanchez's house, this applied equally to defendant since it was his marijuana.  Rader acknowledged, however, he had no physical evidence to show it was defendant's marijuana.

## DISCUSSION

### I

### OVERVIEW OF CALIFORNIA'S MEDICAL MARIJUANA LAWS

In California, marijuana is classified as a Schedule I controlled substance. (§ 11054, subd. (d)(13); *County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 809.)  The state's statutes "specify that, except as authorized or provided by law, it is a crime to possess marijuana (§ 11357), to cultivate, harvest, dry, or process it (§ 11358), to possess it for sale (§ 11359), to transport, import, sell, administer, or furnish it (§ 11360), or to give it away (*ibid*.)."  (*People v. Dowl* (2013) 57 Cal.4th 1079, 1085 (*Dowl*).)

In 1996, however, voters approved Proposition 215, which was codified in section 11362.5 and is known as the Compassionate Use Act (CUA).  Section 11362.5 provides in part:

---

[12]  Rader had spoken with a number of people who admitted they had sold marijuana to clinics or dispensaries.  In Rader's experience, it was common for people involved in a marijuana transaction at a dispensary to call that transaction a donation even if the donor was receiving something in return.  People were often instructed to use the term "donation" to avoid law enforcement, because they could not admit outright that they were selling marijuana, whereas there was verbiage in Proposition 215 about donations by members of a collective.

"(b)(1) The people of the State of California hereby find and declare that the purposes of the Compassionate Use Act of 1996 are as follows:

"(A) To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.

"(B) To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction. [¶] . . . [¶]

"(d) Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."

Subdivision (d) of the CUA thus created a "limited defense" for patients and patients' primary caregivers to the crimes of simple possession or cultivation of marijuana. (*Kirby v. County of Fresno* (2015) 242 Cal.App.4th 940, 952.) The narrowly drafted provision applied "*solely* to qualified patients and their primary caregivers who possess or cultivate marijuana for *the patient's* personal use. [Citation.]" (*People v. London* (2014) 228 Cal.App.4th 544, 551.) It neither altered the statutory provisions barring transportation, possession for sale, and sale of marijuana (*People v. Urziceanu* (2005) 132 Cal.App.4th 747, 773) nor provided for the collective cultivation and distribution of marijuana (*id*. at p. 782).

To invoke a defense under the CUA, a defendant need only introduce at trial evidence raising a reasonable doubt as to the facts underlying the defense. (*Dowl*, *supra*, 57 Cal.4th at p. 1086; *People v. Mower* (2002) 28 Cal.4th 457, 464, 481.) He or she need not establish the severity of his or her illness; as this court has held, "the voters of California did not intend to limit the compassionate use defense to those patients deemed by a jury to be 'seriously ill.' " (*People v. Spark* (2004) 121 Cal.App.4th 259, 268.)

12.

Moreover, "[t]he CUA does not specify an *amount* of marijuana that a patient may possess or cultivate, but simply imposes the requirement that the marijuana must be for the patient's '*personal medical purposes*.' [Citations.] This medical purposes requirement has been judicially construed to mean ' "the *quantity possessed* by the patient . . . , and the form and manner in which it is possessed, *should be reasonably related to the patient's current medical needs*." ' [Citation.]" (*People v. Orlosky* (2015) 233 Cal.App.4th 257, 267 (*Orlosky*); see *People v. Kelly* (2010) 47 Cal.4th 1008, 1013 (*Kelly*).)

"Despite — or, perhaps, because of — this judicial construction of the CUA, questions persisted for both qualified medical marijuana patients and for law enforcement officers relating to enforcement of and arrest for possession, cultivation, and other related marijuana offenses. In 2003, the Legislature found that 'reports from across the state have revealed problems and uncertainties in the [CUA] that have impeded the ability of law enforcement officers to enforce its provisions as the voters intended and, therefore, have prevented qualified patients and designated primary caregivers from obtaining the protections afforded by the act.' [Citation.]" (*Kelly*, *supra*, 47 Cal.4th at pp. 1013-1014.)

In response, the Legislature enacted the Medical Marijuana Program (MMP; § 11362.7 et seq.). (*Dowl*, *supra*, 57 Cal.4th at p. 1086; *Kelly*, *supra*, 47 Cal.4th at p. 1014.) "Under that program, those who provide documentation from an 'attending physician' that they have 'been diagnosed with [certain] serious medical condition[s] and that the medical use of marijuana is appropriate' (§ 11362.715, subd. (a)(2)) may obtain an 'identification card that identifies' them as 'a person authorized to engage in the medical use of marijuana' (§ 11362.71, subd. (d)(3))." (*Dowl*, *supra*, at p. 1086.) Such persons or their designated primary caregivers generally are exempt from "arrest for possession, transportation, delivery, or cultivation of medical marijuana" in specified amounts. (§ 11362.71, subd. (e).)

13.

"The MMP further specifies that a person who (1) 'transports or processes marijuana for his or her own personal medical use' (§ 11362.765, subd. (b)(1)) and (2) either has an identification card or does not have one but is 'entitled to' the CUA's 'protections' (see § 11362.7, subd. (f) [defining 'qualified patient']), 'shall not be subject, on that sole basis, to criminal liability under Section 11357 [(possession of marijuana)], 11358 [(cultivation of marijuana)], 11359 [(possession for sale)], 11360 [(transportation)], 11366 [(maintaining a place for the sale, giving away, or use of marijuana)], 11366.5 [(making available premises for the manufacture, storage or distribution of controlled substances)], or 11570 [(abatement of nuisance created by premises used for manufacture, storage or distribution of controlled substance)].' (§ 11362.765, subd. (a).)" (*Dowl*, *supra*, 57 Cal.4th at p. 1086.)[13]  In addition, in order to effectuate the goal of enhancing the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects, the MMP includes a provision "stating that '[q]ualified patients . . . who associate . . . in order collectively or cooperatively to cultivate marijuana for medical purposes' are exempt from criminal culpability.  [Citations.]" (*Orlosky*, *supra*, 233 Cal.App.4th at p. 267, fn. & italics omitted; see § 11362.775.)

As is apparent from the foregoing, the MMP expanded the affirmative defense to possession and cultivation for personal medical purposes available under the CUA.  (See § 11362.5, subd. (d); *People v. Wright* (2006) 40 Cal.4th 81, 84; *Kirby v. County of Fresno*, *supra*, 242 Cal.App.4th at p. 953; *People v. Urziceanu*, *supra*, 132 Cal.App.4th at p. 786.)  It made clear, however, that it does not "authorize any individual or group to

---

**13**    The identification card program is voluntary.  A person need not obtain an identification card to be entitled to the exemptions provided by state law.  (*County of San Diego v. San Diego NORML*, *supra*, 165 Cal.App.4th at p. 811; see § 11362.71, subd. (f).)

14.

cultivate or distribute marijuana for profit." (§ 11362.765, subd. (a); see *People v. London*, *supra*, 228 Cal.App.4th at pp. 553-554.)

## II

### SUFFICIENCY OF THE EVIDENCE

Defendant contends the evidence was insufficient to sustain his conviction on count 1, possession of marijuana for sale. The applicable legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). Before a judgment can be reversed on this ground, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support [the verdict]. [Citation.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Thus, "[w]here the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

"The elements of possession of narcotics are physical or constructive possession thereof coupled with knowledge of the presence and narcotic character of the drug. [Citations.]  Constructive possession occurs when the accused maintains control or a right to control the contraband . . . .  [Citation.]"  (*People v. Newman* (1971) 5 Cal.3d 48, 52, disapproved on another ground in *People v. Daniels* (1975) 14 Cal.3d 857, 862.)  Possession for sale additionally requires that the defendant intend to sell the drugs.  (*People v. Peck* (1996) 52 Cal.App.4th 351, 357.)  These elements "may be established by circumstantial evidence and any reasonable inferences drawn from such evidence. [Citations.]"  (*People v. Newman*, *supra*, at p. 52.)  Indeed, intent is rarely proven by direct evidence, but must usually be derived from all the circumstances, including the defendant's actions.  (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.)

We have set out the evidence adduced at trial at length, *ante*, and conclude — particularly in light of the amount of marijuana present (even if we consider only what had been fully processed), the amount defendant normally used, and Rader's testimony — it amply supports the jury's determination defendant possessed the marijuana with the requisite intent to sell.  Jurors were not required to credit defendant's assertion he intended to donate his excess marijuana to a clinic or dispensary.

In *People v. Hunt* (1971) 4 Cal.3d 231, 237-238 (*Hunt*), the California Supreme Court stated:

> "In cases involving possession of marijuana [prior to enactment of the CUA and MMP] and heroin, it is settled that an officer with experience in the narcotics field may give his opinion that the narcotics are held for purposes of sale based upon matters such as quantity, packaging, and the normal use of an individual.  On the basis of such testimony convictions of possession for purposes of sale have been upheld.  [Citations.]
>
> "A different situation is presented where an officer testifies that in his opinion a drug, which can and has been lawfully purchased by prescription, is being held unlawfully for purposes of sale.  In the heroin and marijuana situations, the officer experienced in the narcotics field is experienced with the habits of both those who possess for their own use and

16.

those who possess for sale because both groups are engaged in unlawful conduct. As to drugs, which may be purchased by prescription, the officer may have experience with regard to unlawful sales but there is no reason to believe that he will have any substantial experience with the numerous citizens who lawfully purchase the drugs for their own use as medicine for illness.

"In the absence of evidence of some circumstances not to be expected in connection with a patient lawfully using the drugs as medicine, an officer's opinion that possession of lawfully prescribed drugs is for purposes of sale is worthy of little or no weight and should not constitute substantial evidence sufficient to sustain the conviction."

In *People v. Chakos* (2007) 158 Cal.App.4th 357, 359-360 (*Chakos*), the Court of Appeal followed *Hunt* and reversed a post-CUA conviction of possession of marijuana for sale, explaining: "Nowhere in this record do we find any substantial evidence that the arresting officer had any expertise in differentiating citizens who possess marijuana lawfully for their own consumption, as distinct from possessing unlawfully with intent to sell. [Citation.]" (*Chakos*, *supra*, at p. 360.)

Relying on *Hunt* and *Chakos*, defendant asserts Rader lacked expertise in the medical use of marijuana and rejected the validity of California's medical marijuana laws; hence, he was not qualified to render an opinion, and his opinion did not provide substantial evidence defendant possessed the marijuana for sale. Rader's qualifications are set out at length, *ante*, and we need not repeat them here. Notably, he testified he had attended a "Prop 215 update." He also testified he had read numerous materials regarding various types of grows, including those owned and operated by cooperatives, and that there were factors differentiating between a possession-for-sale and a personal-use operation. The trial court expressly found Rader to be an expert. Moreover, in arguing at sidebar concerning the prosecutor's objection that a question asked of Rader on cross-examination called for a legal conclusion, defense counsel stated: "But I think that [Rader's] been qualified as a broad enough expert. He's indicated he has specialized training, Prop 215, classes, which is medical marijuana. That he certainly does have

17.

more knowledge about the subject than the jury does, which is a criteria for an expert." Defendant cannot now claim Rader lacked the necessary expertise. (See *Dowl*, *supra*, 57 Cal.4th at pp. 1082, 1087-1089.)

Despite his failure to object, however, defendant may argue on appeal that the evidence adduced at trial — including Rader's opinion testimony — was insufficient to establish defendant possessed the marijuana for purposes of sale. (*Dowl*, *supra*, 57 Cal.4th at p. 1089.) Having reviewed the record, we reject this argument. "[T]he jury heard not only [Rader's] opinion regarding defendant's intent, but also the officer's testimony regarding the various circumstances that, in his experience, were consistent with that conclusion." (*Id*. at pp. 1089-1090.) Although defendant offered explanations for some of the circumstances, the jury did not have to believe them. (*Id*. at p. 1092.) Because the circumstances surrounding defendant's possession supported Rader's testimony, defendant's reliance on *Hunt* and *Chakos* is unavailing. (See *Dowl*, *supra*, at pp. 1092-1094.)

Defendant argues Rader "rejected the validity of California's medical marijuana laws . . . ." Our review of the testimony presented at trial does not support this assertion. That Rader did not stop investigating merely because someone had a medical marijuana recommendation, personally had never seen a legitimate medical marijuana grow, and felt the medical marijuana laws were being "grossly abused" neither suggests he rejected the law's validity nor rendered his opinion valueless. Defense counsel was free to argue the point to the jury (which he did), and the jury was just as free to credit Rader's testimony, including his opinion.

Sufficient substantial evidence supports defendant's conviction for possession of marijuana for sale.

# III

## ADMISSION OF SANCHEZ'S GUILTY PLEA

### A.    Background

The prosecutor moved, in limine, for admission of Sanchez's felony conviction stemming from this case on the grounds it was (1) relevant to Sanchez's credibility, (2) proof Sanchez did not receive any deal or special consideration in exchange for his testimony, and (3) relevant to the criminal nature of any collective or association defense that might be asserted.  Defense counsel opposed the motion, arguing the conviction was irrelevant to the collective or association defense, as the defense had never contended Sanchez had medical approval or was an associate.  Defense counsel asserted the fact of Sanchez's conviction was irrelevant and "prohibitively prejudicial" under Evidence Code section 352, because the jury would assume that if Sanchez was guilty, then defendant must also be guilty of something.  Counsel also claimed the prosecutor wanted to use the conviction for an improper purpose, namely, to bolster Sanchez's credibility as opposed to impeaching it.

The trial court ruled the prosecutor could impeach Sanchez with the conviction in the People's case-in-chief, and could use it in rebuttal with respect to the collective or association defense.  With respect to Evidence Code section 352, the court found neither use would be more prejudicial than probative, and that the evidence was indeed probative.

Sanchez's trial testimony is summarized in the statement of facts, *ante*.  In part, the prosecutor elicited that Sanchez told the officers the truth about the marijuana that was at the house, knew it was wrong to have all that marijuana at his house, and pled guilty or no contest to a felony charge because of the marijuana that was at the house.  On cross-examination, defense counsel elicited Sanchez was promised he would not go to prison if he pled guilty, knew he was facing up to three years in prison, and received only 180 days in custody in the county jail.  Defense counsel also elicited it was agreed

Sanchez could apply to the sheriff for work furlough or alternative sentencing, and not go to jail at all.

The trial court gave no limiting instruction with respect to Sanchez's conviction, either at the time the evidence was elicited or during instructions, although it did instruct that during the trial, "certain evidence" was admitted for a limited purpose, and jurors could consider such evidence only for that purpose. It also instructed that in evaluating a witness's credibility, the jury could consider, inter alia, whether the witness had been convicted of a felony. Finally, the court instructed a person could be guilty either by directly committing a crime or by aiding and abetting a perpetrator who directly committed the crime, and it gave the standard aiding and abetting instructions.

In his argument to the jury, the prosecutor observed that one of the elements of cultivating marijuana (count 2) was that the defendant unlawfully planted, cultivated, harvested, dried, or processed one or more marijuana plants. The prosecutor reminded jurors they did not have to find defendant personally planted the seeds or watered the plants, as the aiding and abetting instructions allowed him to be convicted even if he was not the one processing the marijuana at Sanchez's home. The prosecutor also argued credibility, and that Sanchez's trial testimony was not truthful. At no time, however, did he refer to Sanchez's guilty plea, let alone suggest that because Sanchez was convicted of a felony based on the marijuana at his house, defendant had to be guilty. The closest he came to mentioning the conviction was to argue defendant was not truly following the law as best he could, because he chose to involve someone who did not have a medical marijuana recommendation and did not care that he was facilitating a crime by Sanchez.

**B.   Analysis**

Defendant now contends Sanchez's guilty plea was inadmissible to prove defendant's guilt, and its admission violated defendant's due process right to freedom from guilt by association. He further contends that if the conviction was going to be admitted, it should have been sanitized; the trial court should have provided a limiting

20.

instruction; and if the trial court had no sua sponte duty to give a limiting instruction, defense counsel's failure to request one constituted ineffective assistance of counsel. We conclude any error was harmless.

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question [citations]. Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

As defendant acknowledges, Sanchez's conviction was probative of his credibility and admissible for impeachment purposes, subject to the trial court's exercise of discretion under Evidence Code section 352. (*People v. Clair* (1992) 2 Cal.4th 629, 654; see Cal. Const., art. I, § 28, subdivision (f)(4).) That the probative value may have been lessened, or the prosecutor's claim of relevance undercut by, the nature and content of Sanchez's trial testimony is immaterial: "We review the correctness of the trial court's ruling at the time it was made, . . . and not by reference to evidence produced at a later date. [Citations.]" (*People v. Welch* (1999) 20 Cal.4th 701, 739.)

"Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion [citations]." (*People v. Clark* (2011) 52 Cal.4th 856, 932.) We see no reason to depart from this rule in the present case.

We recognize "[t]he general rule is that evidence regarding the guilty plea or conviction of a coparticipant in a crime is not admissible *to prove guilt of a defendant*. [Citations.] The rationale for the rule is that a guilty plea or conviction of a participant is

21.

irrelevant to whether another person was *positively and correctly identified* as a coparticipant, and merely invites the inference of guilt by association. [Citations.]" (*People v. Neely* (2009) 176 Cal.App.4th 787, 795, italics added.) Similarly, "[e]vidence of a codefendant's guilty plea[] which is more prejudicial than probative when offered to raise an inference of the defendant's guilt is per se more prejudicial than probative when offered simply to bolster the credibility of another witness." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1322.) Here, however, there was no issue as to identification, and Sanchez's conviction did not bolster the credibility of any witness. (Cf. *People v. Leonard* (1983) 34 Cal.3d 183, 187-189.) Most significantly, Sanchez's conviction was never argued to the jury as evidence defendant was guilty. In light of defendant's CUA defense and the fact the evidence showed he had a genuine medical marijuana recommendation while Sanchez did not, we are confident jurors distinguished between defendant's and Sanchez's situations, and did not consider Sanchez's conviction as evidence defendant was guilty.

For the same reasons, to the extent the prosecutor may have urged admission of, and/or the trial court admitted, the conviction for improper purposes, any error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1103 [applying *Watson* standard to erroneous ruling under Evid. Code, § 352]; *People v. Leonard*, *supra*, 34 Cal.3d at p. 189 [same re: erroneous admission of coarrestee's guilty plea].) "Under *Watson*, the erroneous admission of evidence of [Sanchez's conviction] would constitute reversible error only if a reasonable probability exists that the jury would have reached a different result had this evidence been excluded. [Citations.]" (*People v. Whitson* (1998) 17 Cal.4th 229, 251.) No such probability exists in the present case.

We realize, as defendant argues, the conviction could have been sanitized to prevent the jury from learning Sanchez was convicted in connection with *this* case. (See *People v. Massey* (1987) 192 Cal.App.3d 819, 825.) Because defendant failed to request

sanitization at trial, however, he cannot raise the issue for the first time on appeal. (*People v. Lindberg* (2008) 45 Cal.4th 1, 25.)

We also realize the trial court failed to provide a specific limiting instruction. Again, however, defendant made no such request and the trial court had no sua sponte duty in that regard. (*People v. Smith* (2007) 40 Cal.4th 483, 516; *People v. Farnam* (2002) 28 Cal.4th 107, 163; see Evid. Code, § 355.) The California Supreme Court has "recognize[d] a possible exception in 'an occasional extraordinary case in which unprotested evidence . . . is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.' [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1052.) This is no such extraordinary case, however, and Sanchez's conviction was neither a dominant part of the People's evidence nor highly prejudicial under the circumstances. (See *People v. Farnam*, *supra*, 28 Cal.4th at p. 164.)

Defendant says if we reach the conclusion that the trial court had no sua sponte duty to provide a specific limiting instruction, defense counsel's failure to request a limiting instruction constituted ineffective assistance of counsel. We disagree.

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

"If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

The record contains no explanation for counsel's failure to request a limiting instruction concerning the purpose(s) for which the jury could consider Sanchez's conviction. "[A]lthough we may doubt that a satisfactory explanation could be provided, we are unable to conclude that it could not." (*People v. Bell* (1989) 49 Cal.3d 502, 546.) More importantly, we see no reasonable probability defendant would have obtained a more favorable result had such an instruction been requested and given.

## IV

### INSTRUCTIONAL ERRORS

Although the trial court instructed the jury on the CUA, defendant argues it erred by not properly instructing on the defense theory of the case and refusing to give certain special instructions requested by the defense.[14] We consider each alleged error in turn, and conclude defendant is not entitled to reversal.

---

[14] With respect to cultivating and processing marijuana as charged in count 2, transporting marijuana as charged in count 3, and the lesser included offenses of possession of marijuana and transporting less than 28.5 grams of marijuana, the trial court instructed the jury that such conduct was lawful if authorized by the CUA; the CUA allowed a person to possess, cultivate, or transport marijuana for personal medical purposes when a physician had recommended such use; the amount of marijuana possessed, cultivated, or transported had to be reasonably related to the patient's current medical needs (and whether the method, timing, and distance of the transportation were reasonably related to the patient's current medical needs were to be considered in deciding if marijuana was transported for medical purposes); the compassionate use

## A.    General Legal Principles

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

"In the absence of a request for a particular instruction, a trial court's obligation to instruct on a particular defense arises ' "only if [1] it appears that the defendant is relying on such a defense, or [2] if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' [Citations.]" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148; see *Mathews v. United States* (1988) 485 U.S. 58, 63.) "Under appropriate circumstances, 'a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation].' [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99.) "[A] trial court is required to give a requested instruction relating the reasonable doubt standard of proof to a particular element of the crime charged only when the point of the instruction would not be readily apparent to the jury from the remaining instructions." (*People v. Bolden* (2002) 29 Cal.4th 515, 559.)

---

defense did not require a defendant to present evidence he was seriously ill; and the People had the burden of proving beyond a reasonable doubt the defendant was not authorized to possess, cultivate, or transport marijuana, or, if authorized, possessed, cultivated, or transported an unauthorized amount or for an unauthorized purpose. The court further instructed that if the People had not met that burden, jurors must find defendant not guilty of the particular crime.

"Generally, '[a] party is not entitled to an instruction on a theory for which there is no supporting evidence.' [Citation.]" (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.) Thus, in order to trigger a trial court's sua sponte duty to instruct on an affirmative defense, the record must contain substantial evidence to support that defense. (*People v. Mentch* (2008) 45 Cal.4th 274, 288; *People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive. [Citation.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) Similarly, a trial court need not give a requested instruction unless the defendant "proffers evidence sufficient to 'deserve consideration by the jury, i.e., "evidence from which a jury composed of reasonable [persons] could have concluded" ' that the particular facts underlying the instruction did exist. [Citation.]" (*People v. Barrick* (1982) 33 Cal.3d 115, 132, superseded by constitutional amendment on another ground as stated in *People v. Collins* (1986) 42 Cal.3d 378, 393.)

"In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence . . . ." (*People v. Salas* (2006) 37 Cal.4th 967, 982-983.) " 'Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused' " (*People v. Flannel* (1979) 25 Cal.3d 668, 685, superseded by statute on another ground as stated in *In re Christian S.* (1994) 7 Cal.4th 768, 777), and the defendant's own testimony (or presumably, as in the present case, his or her extrajudicial statements admitted into evidence) can constitute the requisite substantial evidence (see *People v. Lemus* (1988) 203 Cal.App.3d 470, 477). We independently determine whether substantial evidence to support an instruction existed. (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055.)

**B.  Omitted/Refused Instructions**

     1.  Mistake of Fact

       a.  *Background*

Defendant asked the trial court to instruct on mistake of fact pursuant to CALCRIM No. 3406.  As ultimately modified, the instruction would have told jurors defendant was not guilty of cultivation, possession for sale, or transportation of marijuana if he did not have the intent or mental state required to commit the crime because he did not know, or mistakenly believed, a fact; and if defendant's conduct would have been lawful under the facts as he believed them to be, he did not commit the specified crimes. The instruction would have gone on to state that if jurors found defendant believed the amount of marijuana he was responsible for possessing, cultivating, and transporting was reasonably related to his needs, he did not have the specific intent or mental state required for the specified crimes, and if jurors had a reasonable doubt whether defendant had the specific intent or mental state so required, they had to find him not guilty of those crimes.

During the jury instruction conference, the court asked what mistake of fact defendant was claiming, since the defense had contested the amount of marijuana he raised.  Defense counsel pointed to Rader asking defendant why he would plant 50 plants if he only needed six pounds, and defendant asking how many he should have planted. Defense counsel argued:  "That's the mistake of fact that he was laboring under.  The police say he had too much because he planted too much, and he said, 'How much should I have planted?'  [¶]  That clearly indicates a mistake of fact.  And he also said he didn't know how much he used . . . ."

The prosecutor "strongly opposed" CALCRIM No. 3406 being given.  He argued it would be inappropriate, because it would substitute the legal standard as a fact about which defendant was mistaken.  The prosecutor argued there was no evidence defendant was mistaken about the substance being marijuana or about any fact relative to the specific intent to sell element, as he adamantly denied ever intending to sell any

27.

marijuana. The prosecutor observed that the heart of the CUA was whether the amount of marijuana was reasonably related to defendant's current medical needs, and the prosecution did not have to prove defendant believed the amount was reasonable. Defense counsel responded that the mistake of fact was whether defendant knew he was growing, possessing, or transporting more than was reasonably related to his medical needs. If defendant thought the amount was reasonably related but was mistaken, he was entitled to assert the mistake of fact defense. Counsel argued defendant knew the law allowed him to have six pounds and 90 plants, but, as Rader testified, nobody could know whether those 90 plants were going to yield more than defendant needed.

After further consideration of the parties' arguments and case authority submitted to it, the court advised it had determined it should not give CALCRIM No. 3406, but rather should give CALCRIM No. 3407 (Defenses: Mistake of Law). Defense counsel agreed ignorance of the law was no excuse, but asserted the mistake of fact defense had been raised through testimony and would be raised by the defense in argument to the jury. Nevertheless, the court confirmed it would give CALCRIM No. 3407, but not CALCRIM No. 3406.

Pursuant to CALCRIM No. 3407, jurors subsequently were instructed: "It is not a defense to the charged crimes that the defendant did not know he was breaking the law, [or] that he believes his act was lawful."

b.    *Analysis*

"All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Three — Persons who committed the act . . . charged under an ignorance or mistake of fact, which disproves any criminal intent." (Pen. Code, § 26.)

"A mistake of fact occurs when a person understands the facts to be other than what they are. [Citation.]" (*Orlosky*, *supra*, 233 Cal.App.4th at p. 275.) "When a person commits an act based on a mistake of fact, his guilt or innocence is determined as if the facts were as he perceived them. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68,

28.

87-88.) The mistake of fact defense "requires, at a minimum, an actual belief 'in the existence of circumstances, which, if true, would make the act with which the person is charged an innocent act . . . .' [Citations.] For general intent crimes, the defendant's mistaken belief must be both actual and reasonable, but if the mental state of the crime is a specific intent or knowledge, then the mistaken belief must only be actual. [Citations.] In all cases, however, the defendant's mistaken belief must relate to a set of circumstances which, if existent or true, would make the act charged an innocent act." (*People v. Lawson* (2013) 215 Cal.App.4th 108, 115.) As a general matter, a mistake of fact defense "is not available unless the mistake disproves an element of the offense. [Citations.]" (*In re Jennings* (2004) 34 Cal.4th 254, 277.)

We are not convinced the trial court erred by refusing to give CALCRIM No. 3406, as modified. As the Court of Appeal reasoned in *Orlosky*, *supra*, 233 Cal.App.4th at pages 275 through 276: "In defendant's trial, factors such as the potential yield from the plants and the amount medically needed by defendant were not presented as *actual facts* that defendant could have *misperceived* to potentially relieve him of culpability; rather, they were presented as opinions and matters that could vary depending on the circumstances. . . . [¶] On this record, showing a multiplicity of views and opinions concerning yield expectations and reasonable usage amounts, a defense claim that defendant miscalculated or misunderstood these matters arose not from misperceptions of the facts *as they actually were* but rather from the existence of different viewpoints and uncertainties concerning yield and usage amounts. These differing views and uncertainties were relevant for the jury to consider when evaluating all the circumstances to determine whether defendant confined his possession and cultivation to amounts reasonably related to medical purposes, but they were not actual facts that were misunderstood by defendant as normally contemplated by the mistake of fact defense."

*Orlosky* dealt with a claim the trial court erred by failing to instruct on mistake of fact on its own motion, or, alternatively, that defense counsel was ineffective for failing

29.

to request such an instruction. (*Orlosky*, *supra*, 233 Cal.App.4th at p. 274.) Here, of course, defendant requested the instruction. Nevertheless, we find the opinion instructive. Moreover, in our case, although defendant was not growing more than the number of plants stated in his doctor's recommendation, he already possessed well beyond the amount of processed marijuana recommended, with much more of the harvest still to be processed. In addition, the fact his doctor told him he could donate his excess to a clinic shows it was contemplated from the outset that he would produce more than was reasonably related to his medical needs. Thus, defendant lacked the requisite genuine belief he was only responsible for an amount of marijuana that was reasonably related to his medical needs. To the extent defendant may have misunderstood what could legally be done with any excess marijuana, the mistake was one of law and not a defense. (See *People v. Urziceanu*, *supra*, 132 Cal.App.4th at pp. 775-776.)

*Orlosky* recognizes that in some circumstances, it might be appropriate to provide a mistake of fact instruction with respect to the issue of reasonable medical needs. (*Orlosky*, *supra*, 233 Cal.App.4th at p. 276.) We do not find this to be such a case. Were we to conclude CALCRIM No. 3406 should have been given (whether sua sponte or upon request) because defendant was relying on the defense, however (see *People v. Russell* (2006) 144 Cal.App.4th 1415, 1427), we would find the error harmless.

It has been held that error in failing to instruct on the mistake of fact defense is subject to review under the *Watson* standard of prejudice. (*People v. Hanna* (2013) 218 Cal.App.4th 455, 462; *People v. Russell*, *supra*, 144 Cal.App.4th at p. 1431; see *People v. Watt* (2014) 229 Cal.App.4th 1215, 1219-1220.) Even under the more rigorous test of *Chapman v. California* (1967) 386 U.S. 18, 24, reversal is not required if the issue necessarily was decided under other instructions that were given (*People v. Watt*, *supra*, at p. 1220).[15] In the present case, the jury found, beyond a reasonable doubt, that

---

[15] Defendant cites *U.S. v. Escobar de Bright* (9th Cir. 1984) 742 F.2d 1196, 1201, for the proposition the error is reversible per se. As a decision of a lower federal court, that

defendant possessed the marijuana with the specific intent to sell it. Had they believed he was acting under a genuine mistake of fact, as put forward in his defense, they would not have found a specific intent to sell the marijuana. Thus, the record demonstrates — as to all counts — the jury rejected the factual predicate of the omitted mistake of fact instruction. Hence, any error was harmless under any standard. (See *People v. Wright*, *supra*, 40 Cal.4th at p. 99; *People v. Vineberg* (1981) 125 Cal.App.3d 127, 136, fn. 6; see also *People v. Saavedra* (2007) 156 Cal.App.4th 561, 569-570.)

Defendant contends, however, that the definition of "selling" the trial court gave the jury, pursuant to CALCRIM No. 2352, in connection with count 1 — "Selling, for the purpose of this instruction, means exchanging the marijuana for money, services, or anything of value" — did not comport with the MMP, and so permitted defendant to be convicted even if jurors found he intended to donate the excess marijuana.[16]

A sale of drugs is a transfer of possession of the drug to another in return for cash or a nonmonetary commodity. (*People v. Peck*, *supra*, 52 Cal.App.4th at p. 357; *People v. Lazenby* (1992) 6 Cal.App.4th 1842, 1845.) The CUA does not contemplate the lawful

---

opinion is not binding on us. (*People v. Williams* (1997) 16 Cal.4th 153, 190.) Moreover, it antedates the United States Supreme Court's decision in *Neder v. United States* (1999) 527 U.S. 1, which "makes clear that harmless-error analysis applies to instructional errors so long as the error at issue does not categorically ' "vitiat[e] *all* the jury's findings." ' [Citation.]" (*Hedgpeth v. Pulido* (2008) 555 U.S. 57, 61, quoting *Neder v. United States*, *supra*, at p. 11.) Any error in the present case clearly did not vitiate all the jury's findings; defendant was permitted to — and did — fully present his defense and argue it to the jury, and the prosecutor addressed it in his argument to the jury. (See *People v. Watt*, *supra*, 229 Cal.App.4th at p. 1219.) Moreover, the California Supreme Court has determined instructional error "generally is not a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal under the federal Constitution." (*People v. Flood* (1998) 18 Cal.4th 470, 503.)

[16]     We assume, since defendant did not state this point under a separate heading or subheading (see Cal. Rules of Court, rule 8.204(a)(1)(B)), he is claiming error only insofar as the definition of "selling" impacts the effect of the trial court's refusal to instruct on mistake of fact.

sale of medical marijuana, but instead permits a patient and his or her primary caregiver to grow or possess marijuana *solely* for the *patient's* medical purposes. (§ 11362.5, subd. (d); *People v. London*, *supra*, 228 Cal.App.4th at p. 564.) The MMP, in contrast, "allows qualified patients, valid identification cardholders, and their respective primary caregivers, if any, to form nonprofit groups, and through those groups, pay each other and receive compensation and reimbursement from each other in amounts necessary to cover the 'overhead costs and operating expenses' of cultivating and providing medical marijuana to the qualified patient and valid cardholder members of the group. [Citations.]" (*People v. London*, *supra*, at p. 564, italics omitted; see §§ 11362.765, 11362.775; Cal. Atty. Gen., Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use (Aug. 2008), § IV.B.6., p. 10, at <http://ag.ca.gov/ cms_attachments/press/pdfs/n1601_medicalmarijuanaguidelines.pdf> [as of May 24, 2016] (Guidelines).)[17]

The MMP does not permit the cultivation or distribution of marijuana for profit, whether by an individual or a group. (§ 11362.765, subd. (a).) Under the Guidelines, collectives and cooperatives are to acquire marijuana only from their constituent members, and they then can allocate the marijuana to other members of the group. (Guidelines, *supra*, § IV.B.4., p. 10.) They may not distribute medical marijuana to anyone who is not a member in good standing of the organization, although they may credit members for marijuana the members provide to the collective for allocation to other members. (*Id.*, § IV.B.5., p. 10.) Marijuana grown at a collective or cooperative for medical purposes may be provided free to qualified patients and primary caregivers who are members of the organization, provided in exchange for services rendered to the

---

**17** The Guidelines, which were issued by then-Attorney General Edmund G. Brown, Jr., as directed by section 11362.81, subdivision (d), "are not binding on the courts but are entitled to 'considerable weight.' [Citations.]" (*People v. London*, *supra*, 228 Cal.App.4th at p. 554.)

entity, and/or allocated based on fees that are reasonably calculated to cover overhead costs and operating expenses. (*Id.*, § IV.B.6., p. 10.)

In the present case, there was no evidence defendant was a member of any collective or cooperative under the MMP. There was no evidence he knew of any specific lawful dispensary, or that he intended to become a member of one. Instead, he made a vague mention of one he had heard gave plants or gifts in return for donations of marijuana. While providing marijuana plants or marijuana products in exchange for services rendered to the collective or cooperative in the form of growing or processing marijuana is permissible under some circumstances (see Guidelines, *supra*, § IV.B.6., p. 10), there was insufficient evidence here to allow us to say the definition of "selling" contained in the standard jury instruction was incorrect.[18]

2.  Special Instruction No. 1

Defendant asked the trial court to give various special instructions. Special instruction No. 1 would have told jurors: "Qualified patients who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under <u>Health and Safety Code</u> Sections 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570."

The prosecutor acknowledged the instruction was an accurate statement of the law, but opposed it on the ground it was not supported by substantial evidence. He argued the

---

[18]    In conjunction with a different instruction, defense counsel argued nothing in the law said defendant had to be a member of an association "ahead of time." If he had only cultivated and possessed an amount of marijuana reasonably related to his own medical needs, this might be true. If defendant was going to grow and process marijuana in quantities that far exceeded any reasonable relationship to his personal medical needs and seek to escape criminal sanctions therefor under the collective/cooperative cultivation provisions of the MMP, however, it behooved him to bring himself under the umbrella of an association meeting the MMP's requirements *before* he acquired said excess marijuana. (Cf. *People v. Mitchell* (2014) 225 Cal.App.4th 1189, 1206-1208.)

33.

only evidence possibly pertaining to the instruction was defendant's vague statement he intended to donate any excess to a clinic; however, defendant could not name any particular dispensary or clinic or organization with which he associated, and did not articulate he was a qualifying member of any particular association. Given the absence of supporting details or evidence, the prosecutor claimed, defendant's "vague statement" did not constitute substantial evidence to support the giving of the instruction. Defense counsel responded it was a pinpoint instruction, and there was nothing in the law that said defendant had to be a member of an association ahead of time. Counsel argued the marijuana was not ready to donate yet, mold could have appeared so that there may have been no usable marijuana in excess of the six pounds defendant was authorized to possess, and defendant made a clear statement of his intent.

The court declined to give the instruction. It concluded defendant's statement alone was "not substantial evidence of associates."

The court did not err. Defendant's statement he intended to donate any excess marijuana to a clinic did not constitute substantial evidence he associated with other qualified patients to collectively or cooperatively cultivate marijuana for medical purposes, or even that he intended to do so. At most, the evidence showed he associated with Sanchez, whom the evidence established was not a qualified patient. (Cf. *Orlosky*, *supra*, 233 Cal.App.4th at pp. 271-272; *People v. Colvin* (2012) 203 Cal.App.4th 1029, 1037.) To the extent the instruction would have informed jurors medical marijuana collectives/cooperatives were not necessarily illegal, the instruction was unnecessary, as neither the testimony nor the arguments of counsel suggested such enterprises could not be legal. Indeed, Rader testified concerning the existence of legitimate dispensaries.

3.      Special Instructions Nos. 2 and 6

Defendant's requested special instruction No. 2 would have told jurors: "No individual may cultivate or distribute marijuana for profit." Special instruction No. 6 would have defined "profit" as "[t]he surplus remaining after total costs are deducted

34.

from total revenue, or a financial gain, especially the difference between the amount earned and the amount spent in buying, operating, or producing something."

The prosecutor argued special instruction No. 2 was simply a corollary to special instruction No. 1, which was related to medical marijuana collectives or cooperatives. Defense counsel asserted the instruction was necessary in light of the evidence defendant intended to donate his excess marijuana. Counsel argued the jury needed to know that was "okay," as there was no profit involved.

The trial court refused to give either instruction. Defendant says this was error, particularly in light of the definition of "selling" contained in CALCRIM No. 2352, and the prosecutor's argument to the jury that donating marijuana and receiving marijuana plants and gifts in return constituted "selling" for purposes of possession with intent to sell.

"Though nothing in the MMP[] allows any individual or group to cultivate or distribute marijuana for profit [citation], the Guidelines allow marijuana *grown through a nonprofit collective or cooperative* to be '[a]llocated based on fees that are reasonably calculated to cover overhead costs and operating expenses.' [Citations.]" (*People v. London*, *supra*, 228 Cal.App.4th at p. 564, italics added; see *People v. Baniani* (2014) 229 Cal.App.4th 45, 56.) Defendant's marijuana was not grown through a nonprofit collective or cooperative, he was not a member of any such organization, and he failed to present any evidence concerning any legitimate organization of which he intended to become a member. He also intended to receive something of value in return for his marijuana.

Given the lack of evidence defendant was "lawfully cultivating and lawfully possessing marijuana for sale, on a nonprofit basis, to a lawfully operating marijuana collective" (*People v. London*, *supra*, 228 Cal.App.4th at p. 566), the trial court correctly refused to give the instructions.

4.     Special Instruction No. 3

Special instruction No. 3 would have told jurors: "It is presumed that official duty has been regularly performed." Defense counsel contended the evidence showed there were dispensaries that had to receive their marijuana somehow. He stated his intention to argue that if the police believed the dispensary system was illegal, they would have a duty to shut down the illegal ones. The trial court refused to give the instruction.

There was no error. The instruction stated verbatim the presumption contained in Evidence Code section 664, which applies to law enforcement officers. (*Fisk v. Department of Motor Vehicles* (1981) 127 Cal.App.3d 72, 77; see *People v. Farrara* (1956) 46 Cal.2d 265, 269.) Accordingly, it correctly stated the law. However, there was no issue at trial concerning whether the dispensary system itself was illegal, or whether dispensaries, cooperatives, or collectives operating lawfully under the MMP and local ordinances existed.[19] As we previously observed, Rader testified concerning the existence of legitimate dispensaries, and agreed with defense counsel that there were many dispensaries in California and in Tulare County. The prosecutor never claimed otherwise.

Defendant points to the following exchange during defense counsel's summation to the jury:

> "The third element, did [defendant] intend that there be too much? Well, his statement was clearly no. He thought he was doing okay. The idea that it is illegal for a grower to take his material to a dispensary, a clinic, and distribute it, why the heck are there hundreds of them operating in California if it's illegal per se for a grower to take his product to a dispensary and have that dispensary distribute it? This man [Rader] would be out busting them. You know that (indicating). And he can't because it's not illegal.

---

[19]     The California Supreme Court has held that California's medical marijuana statutes do not preempt a local ban on facilities that distribute medical marijuana. (*City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729, 737.)

"[PROSECUTOR]: Objection, misstates the law.

"THE COURT: Again, if — you must be guided by the law I give you. And if there's any question about what the law is, you must follow what I've instructed you. [¶] . . . [¶]

"[DEFENSE COUNSEL]: And also remember the judge told you several times don't lose your common sense. Your common sense will tell you that dispensaries were legal. Egg has to get from the chicken to the plate somehow. Somebody has to grow it and take it to the dispensary so the dispensary can then distribute. Common sense. And I submit the law allows that under the Compassionate Use Act."

Defendant says the problem with the trial court's ruling on the objection is that the court refused to fully instruct the jury on the law, as requested by defense counsel. Again, however, the issue was not the legality of the dispensary system, and there was never any suggestion it was per se illegal for a grower to take his or her marijuana to a dispensary and have it distributed. (See §§ 11362.765, 11362.775; Guidelines, *supra*, § IV.B.4., p. 10.)

5.     Special Instruction No. 4

Defendant's requested special instruction No. 4 provided: "Questions asked by the police of the Defendant are not evidence, and only are relevant to establish meaning of the Defendant's answers. You can only consider the answers of the Defendant as possible evidence of his guilt or innocence, not the suggestions or inferences of the police questions." Cited as authority was CALCRIM No. 104, modified to include questions by the police as well as counsel.[20]

The prosecutor opposed the instruction on two grounds. First, he argued it was not necessary in light of standard instructions defining evidence and statements the jury could

---

[20]     CALCRIM No. 104 states, in pertinent part: "Nothing that the attorneys say is evidence. . . . Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they help you understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asks a question that suggests it is true."

consider for the truth of the matter. Second, he argued the instruction was contrary to the law regarding adoptive admissions. Defense counsel responded that although there was testimony about investigative techniques versus opinions, "that needs to be reinforced by a pinpoint instruction." He argued that Rader's characterizing defendant's statements as "bull crap" and "unbelievable" added "potential weight in the juror's mind that [Rader's] statements during the interrogation [could] be taken as evidence"; moreover, "[b]ull crap" was "not an assertion of a position that somebody is supposed to deny."

The trial court refused to give the instruction. It did not err. It was made clear to the jury on multiple occasions that Rader's statements to defendant, challenging the veracity of defendant's statements, constituted investigative techniques. It was also made clear that Rader could testify to the techniques he used, but not as to any conclusions or opinion concerning whether defendant was lying.[21] Moreover, defense counsel cross-examined Rader on his questions and statements to defendant. Given these circumstances, the requested instruction was not necessary and even had the potential of confusing the jury.

Defendant's reliance on *People v. Kimble* (1988) 44 Cal.3d 480, 498 (*Kimble*) is unavailing. In that case, the defendant claimed the trial court should have excluded certain portions of his statement to police in part because the jury may have inferred from some of the officers' questions that officers had additional evidence against the defendant that was not introduced at trial. (*Id*. at pp. 498-499, fn. 14.) The California Supreme Court rejected the argument, noting the jury was instructed that questions were not

---

**21**     At one point, Rader testified, "I did challenge [defendant]. I basically accused him of lying. I felt he was lying." In response to defense counsel's objection and request for an admonition, the trial court told jurors: "He can testify as to the techniques that he used, but with respect to any conclusion, he may not. [¶] His opinion as to whether he was lying or not, that's struck. He may testify as to any techniques he used for interrogation purposes, but not his personal opinion as to whether he was lying or not. That is stricken from the record. You're not to consider it for any purpose. [¶] Any time I strike testimony, that's not in evidence and you may not consider it."

evidence and jurors were not to assume to be true any insinuation suggested by a question asked a witness, and the defendant could have requested a more specific instruction if he felt the jury might not apply the instruction to the officers' interrogation questions. (*Ibid.*)

*Kimble* does not stand for the proposition a trial court must grant a request for such an instruction in all situations. In the present case, Rader's questions to defendant carried no insinuation concerning additional evidence not presented to the jury. Moreover, the purposes for which jurors could consider his questions and comments to defendant were amply explained without the requested instruction.

     6.     <u>Special Instruction No. 7</u>

Defendant's requested special instruction No. 7, which cited subdivision (d) of section 11362.77 as authority, would have told jurors: "Only the dried mature processed flowers of the female cannabis plant . . . shall be considered when determining allowable quantities of marijuana under the law."

The prosecutor opposed the instruction being given. He argued subdivision (d) of section 11362.77 simply referred to a subdivision of the statute ruled unconstitutional by the California Supreme Court in *Kelly*, *supra*, 47 Cal.4th 1008, and that the law permitted juries to consider all parts of the cannabis plant. Defense counsel responded that *Kelly* only invalidated the statute's limits on possession, but specifically left standing the remainder of the statute. He also argued the general definition of marijuana as including all parts of the cannabis plant had been superseded by subdivision (d) of section 11362.77.

The court declined to give the instruction. Even assuming it erred, defendant has failed to establish prejudice.

" 'Marijuana' " generally is defined to include all parts of the cannabis plant, except the mature stalks. (§ 11018; see § 11001.) However, section 11362.77 provides, in pertinent part:

39.

"(a) A qualified patient or primary caregiver may possess no more than eight ounces of dried marijuana per qualified patient. In addition, a qualified patient or primary caregiver may also maintain no more than six mature or 12 immature marijuana plants per qualified patient.

"(b) If a qualified patient or primary caregiver has a doctor's recommendation that this quantity does not meet the qualified patient's medical needs, the qualified patient or primary caregiver may possess an amount of marijuana consistent with the patient's needs. [¶] . . . [¶]

"(d) Only the dried mature processed flowers of female cannabis plant . . . shall be considered when determining allowable quantities of marijuana under this section. [¶] . . . [¶]

"(f) A qualified patient or a person holding a valid identification card, or the designated primary caregiver of that qualified patient or person, may possess amounts of marijuana consistent with this article."

In *Kelly*, *supra*, 47 Cal.4th at page 1012, the California Supreme Court held that insofar as section 11362.77 "burden[s] a defense under the CUA to a criminal charge of possessing or cultivating marijuana" by "prescrib[ing] a specific amount of marijuana that a 'qualified patient' may possess or cultivate," it impermissibly amended the CUA without approval of the electorate, and so is invalid under article II, section 10, subdivision (c) of the California Constitution.[22]

The high court noted the CUA does not specify an amount of marijuana a patient may possess or cultivate; rather, it requires that the marijuana possessed or cultivated must be for the patient's personal medical purposes, which has been judicially construed to mean the quantity possessed by the patient or primary caregiver, and the form and manner in which it is possessed, must be reasonably related to the patient's current medical needs. (*Kelly*, *supra*, 47 Cal.4th at p. 1013.) While not literally amending the CUA, the MMP added 18 new code sections addressing the general subject matter

---

[22] That provision states: "The Legislature may amend or repeal referendum statutes. It may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval."

covered by the CUA. (*Kelly*, *supra*, at p. 1014.) Section 11362.77 did two significant things: "(1) it establish[ed] *quantity limitations*, and (2) it set[] forth a 'safe harbor' by authorizing possession of specific amounts of medical marijuana within those specific limits." (*Kelly*, *supra*, at p. 1015, fn. omitted.) The court concluded that "[b]y extending the reach of section 11362.77's quantity limitations beyond those persons who voluntarily register under the MMP and obtain an identification card that provides protection against arrest — and by additionally restricting the rights of all 'qualified patients' and 'primary caregivers' who fall under the CUA — the challenged language of section 11362.77 effectuates a change in the CUA that takes away from rights granted by the initiative statute. [Citations.] In this sense, section 11362.77's quantity limitations conflict with — and thereby substantially restrict — the CUA's guarantee that a qualified patient may possess and cultivate *any amount of marijuana reasonably necessary for his or her current medical condition*. In that respect, section 11362.77 improperly amends the CUA in violation of the California Constitution." (*Kelly*, *supra*, 47 Cal.4th at p. 1043, fn. omitted.)

Nevertheless, the court rejected the notion section 11362.77 had to be severed from the MMP and voided in its entirety. (*Kelly*, *supra*, 47 Cal.4th at p. 1047.) It reasoned the statute continued to have legal significance and could operate as part of the MMP, even though it could not constitutionally restrict a CUA defense; hence, the appropriate remedy was to disapprove only the unconstitutional application of section 11362.77, "thereby preserving any residuary constitutional application with regard to the other provisions of the MMP. [Citation.]" (*Kelly*, *supra*, at p. 1048.) The Supreme Court stated:

> "Whether or not a person entitled to register under the MMP elects to do so, that individual, so long as he or she meets the definition of a patient or primary caregiver under the CUA, retains all the rights afforded by the CUA. Thus, such a person may assert, as a defense in court, that he or she possessed or cultivated an amount of marijuana reasonably related to

41.

meet his or her current medical needs [citation], without reference to the specific quantitative limitations specified by the MMP.

"We conclude as follows:  To the extent section 11362.77 (together with its quantitative limitations) impermissibly amends the CUA by burdening a defense that would be available pursuant to that initiative statute, section 11362.77 is invalid under California Constitution, article II, section 10, subdivision (c).  Nevertheless, it would be inappropriate to sever section 11362.77 from the MMP and hence void that provision in its entirety."  (*Kelly*, *supra*, 47 Cal.4th at p. 1049.)

As set out *ante*, subdivision (d) of section 11362.77 limits the parts of a marijuana plant that can be considered "when determining allowable quantities of marijuana *under this section*."  (Italics added.)  Normally, "this section" would be construed to mean section 11362.77.  (See Pen. Code, § 7, subd. 20.)

We need not determine whether this portion of the statute was nullified when *Kelly* invalidated the quantity limitations contained in subdivision (a) of section 11362.77, or whether it extends to the CUA, which is set out in section 11362.5.  In the present case, defendant possessed 9.88 pounds of fully processed marijuana — marijuana consisting of the flower that had been dried and trimmed to remove as much excess stem and leaf material as possible.  Rader — an expert — calculated the partially processed marijuana found at the house would have yielded at least 40 pounds of fully processed marijuana.  Rader also testified the flower or bud was what counted as weight in terms of medical marijuana patients, and that, while marijuana plants could be either male or female, the common practice of growers was to pull and discard the majority or all the male plants at the time the plants showed they were male.  Under these circumstances, it is simply not reasonably probable the jury would have come to a different conclusion had the requested instruction been given.  (See *People v. Earp* (1999) 20 Cal.4th 826, 887 [applying *Watson* standard to failure to give requested defense pinpoint instruction].)

42.

7. <u>Special Instruction No. 8</u>

Last, special instruction No. 8 would have told jurors: "Any individual who provides assistance to a qualified patient in acquiring the skills necessary to cultivate marijuana for medical purposes to the qualified patient is not subject to criminal liability under section 11357, 11358, 11359, 11360." Defense counsel asserted there was evidence Sanchez had the requisite knowledge and defendant did not, and so it was proper for counsel to argue to the jury that Sanchez was providing the skills necessary to cultivate and process the marijuana. Defense counsel contended that regardless of whether Sanchez had a defense, defendant could raise this point to the jury. The prosecutor opposed the giving of the instruction, arguing the evidence showed Sanchez was processing the marijuana, not that he was teaching someone else to do it.

The court refused to give the instruction. It did not err.

Sanchez testified at trial that he did not do anything with the marijuana, did not know how to process or trim it, and was never shown by defendant how to process or trim it. He told Rader, however, that he had brought it to his house to process it, and that he learned to process it by watching the news (the first version) or on his own (the second version). Defendant never said anything to Rader concerning whether he had knowledge of how to process the marijuana.

"[A]s relevant here, subdivision (b)(3) of section 11362.765 grants immunity to a specific group of individuals — those who assist in administering medical marijuana or acquiring the skills necessary to cultivate it — for specific conduct, namely, assistance in the administration of, or teaching how to cultivate, medical marijuana. This immunity is significant; in its absence, those who assist patients or primary caregivers in learning how to cultivate marijuana might themselves be open to prosecution for cultivation. [Citation.]" (*People v. Mentch*, *supra*, 45 Cal.4th at p. 291, fn. omitted.)[23]

---

[23]    Section 11362.765 provides, in pertinent part:  "(a) Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be subject, on that sole

There was no evidence Sanchez was *teaching* defendant anything.  Rather, the evidence showed he either had nothing to do with the marijuana, or he himself was processing the marijuana for defendant.  Either way, section 11362.765, subdivision (a) provided him with no defense.  (See *People v. Mentch*, *supra*, 45 Cal.4th at p. 292.)  This being the case, and in light of Sanchez's guilty plea, defendant was not entitled to the instruction.  The giving of aiding and abetting instructions, and the prosecutor's argument thereon, do not change this.

## **DISPOSITION**

The judgment is affirmed.

_____

DETJEN, J.

WE CONCUR:


_____

LEVY, Acting P.J.


_____

FRANSON, J.

---

basis, to criminal liability under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570.  However, nothing in this section shall authorize . . .  any individual or group to cultivate or distribute marijuana for profit.  [¶]  (b) Subdivision (a) shall apply to all of the following:  [¶] . . . [¶]  (3) Any individual who provides assistance to a qualified patient or a person with an identification card, or his or her designated primary caregiver, in administering medical marijuana to the qualified patient or person or acquiring the skills necessary to cultivate or administer marijuana for medical purposes to the qualified patient or person."